*FILED

2025 NOV 12 PM 3: 24

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY:_____

BRETT A. SHUMATE
Assistant Attorney General
DREW C. ENSIGN
Deputy Assistant Attorney General
Civil Division
WILLIAM C. SILVIS
Assistant Director
ZACHARY A CARDIN
Trial Attorney
KRISTEN GIUFFREDA
PATRICK GLEN
MICHAEL CELONE
Senior Litigation Counsel
United States Department of Justice
Office of Immigration Litigation – General Litigation and Appeals Section
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
202-802-3410
Zachary.a.cardin@usdoj.gov
Attorneys for Defendants

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Jose Antonio PEREZ-FUNEZ; *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. Department of Homeland Security, *et al.*,<br><br>Defendants. | ) Case No. CV 81-1457-ER<br>)<br>) **DEFENDANTS' NOTICE OF MOTION**<br>) **AND MOTION TO TERMINATE**<br>) **PERMANENT INJUNCTION AND**<br>) **ADVISAL ORDER; MEMORANDUM**<br>) **OF POINTS AND AUTHORITIES IN**<br>) **SUPPORT OF MOTION**<br>) Fed. R. Civ. P. 60(b)(4), (5) & (6)<br>) Hearing Date: December 5th, 2025<br>) Time: 10:00AM<br>) Place: TBD<br>) Honorable Edward Rafeedie<br>)<br>) United States District Judge |

# TABLE OF CONTENTS

NOTICE OF MOTION...................................................................................... iv

COMPLIANCE WITH LOCAL RULE 7-3 ..................................................... iv

MOTION TO TERMINATE PERMANENT INJUNCTION AND ADVISAL
ORDER............................................................................................................. v

MEMORANDUM OF POINTS AND AUTHORITIES .....1**Error! Bookmark not
defined.**

INTRODUCTION ............................................................................................. 1

BACKGROUND .............................................................................................. 3

    A.    The Court's 1985 Decision and 1986 Implementing Order ................. 3

    B.    Intervening Statutory and Regulatory Developments ......................... 6

STANDARD OF REVIEW ............................................................................... 9

ARGUMENT .................................................................................................. 11

I.    Dissolution of the Class-Wide Injunction Is Required Under § 1252(f) ... and
the Supreme Court's Intervening Decision in *Aleman Gonzalez* ................. 11

II.    Termination of the Injunction Is Warranted Because Prospective Application
Is No Longer Equitable ..................................................................... 13

    A.    Maintaining the Injunction Is No Longer Equitable Because Significant
Changes in Immigration Law and Regulation Have Materially Altered
the Legal Landscape ............................................................. 13

    B.    Maintaining the Injunction Is No Longer Equitable Because
Subsequent Factual Developments Render the Injunction Severely
Outdated.............................................................................. 17

    C.    Maintaining the Injunction Is No Longer Equitable Because It
Perpetually Entangles the Judiciary in Core Executive Functions..... 19

CONCLUSION ............................................................................................. 21

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

619 F. Supp.........................................................................................................6, 16

619 F. Supp. 656.............................................................................................passim

*Ackermann v. United States,*
  340 U.S. 193 (1959) ...................................................................................... 20

*Agostini v. Felton,*
  521 U.S. 203 (1997) ................................................................................. 11, 12

*Arlington Heights v. Metro. Hous. Dev. Corp.,*
  429 U.S. 252 (1977) .................................................................................2, 3, 19

*Bankers Mortgage Co. v. United States,*
  423 F.2d 73 (5th Cir. 1970)........................................................................ 20

*Buck v. Davis,*
  580 U.S. 100 (2017) ...................................................................................... 10

*City of Chicago v. Barr,*
  961 F.3d 882 (7th Cir. 2020)......................................................................... 7

*Fiallo v. Bell,*
  430 U.S. 787 (1977) ...................................................................................... 19

*Galvez v. Jaddou,*
  52 F.4th 821 (9th Cir. 2022)....................................................................... 12

*Garland v. Aleman Gonzalez,*
  596 U.S. 543 (2022) ..........................................................................vi, 2, 11

*Harisiades v. Shaughnessy,*
  342 U.S. 580 (1952) ................................................................................. 2, 20

*Henson v. Fid. Nat'l Fin., Inc.,*
  943 F.3d 434 (9th Cir. 2019)....................................................................... 10

*Horne v. Flores,*
  557 U.S. 433 (2009) .................................................................................passim

*Liljeberg v. Health Servs. Acquisition Corp.,*
  486 U.S. 847 (1988) ...................................................................................... 10

*Make the Rd. N.Y. v. Wolf,*
  962 F.3d 612 (D.C. Cir. 2020) .................................................................... 8

*Mathews v. Diaz,*
  426 U.S. 67 (1976) ....................................................................3, 19, 20, 21

ii

*Matthews v. Eldridge,*
   424 U.S. 319 (1976) ....................................................................................5
*Reno v. American-Arab Anti-Discrimination Comm.,*
   525 U.S. 471 (1999) ...................................................................................7
*Reno v. Flores,*
   507 U.S. 292 (1993) .................................................................................20
*Rufo v. Inmates of Suffolk Cnty. Jail,*
   502 U.S. 367 (1992) ..........................................................................passim
*Trump v. Hawaii,*
   585 U.S. 667 (2018) ...........................................................................19, 20
*United States v. Sparks,*
   685 F.2d 1128 (9th Cir. 1982).................................................................10
*Wages v. IRS,*
   915 F.2d 1230 (9th Cir. 1990)...................................................................9

**Statutes**

6 U.S.C. § 279(b)(1)(B)...................................................................................7
8 U.S.C. § 1225(a)(4) ......................................................................8, 9, 12, 14
8 U.S.C. § 1229a.....................................................................................2, 8, 14
8 U.S.C. § 1229c.................................................................................7, 8, 12, 14
8 U.S.C. § 1232 ...............................................................................3, 14, 15
8 U.S.C. § 1232(a)(1) .................................................................................8, 9
8 U.S.C. § 1232(a)(2) ....................................................................................14
8 U.S.C. § 1232(a)(5) ......................................................................................8
8 U.S.C. § 1232(a)(5)(D)................................................................................16
8 U.S.C. § 1232(b)(3) .....................................................................................14
8 U.S.C. § 1232(c)(5) .....................................................................................14
8 U.S.C. § 1252(f)(1)..................................................................vi, 2, 11, 12
8 U.S.C. § 1252 ...............................................................................................2
8 U.S.C. § 1254 ...............................................................................................3

**Rules**

Fed. R. Civ. P. 60(b)(4).........................................................................passim
Fed. R. Civ. P. 60(b)(5).................................................................................9, 10
Fed. R. Civ. P. 60(b)(6).................................................................................10
Federal Rule of Civil Procedure 60(b) ..........................................................2

## NOTICE OF MOTION

PLEASE TAKE NOTICE that on December 5, 2025 at 10:00AM or as soon thereafter as the matter may be heard, Defendants will and hereby do move this Court pursuant to Federal Rules of Civil Procedure 60(b)(4), 60(b)(5), and 60(b)(6) for an order terminating the permanent injunction entered in this action on September 30, 1985 (Dkt. No. 226, reported at 619 F. Supp. 656) and the subsequent "Order Re Advisal" entered on May 14, 1986 (Dkt. No. 240).

## COMPLIANCE WITH LOCAL RULE 7-3

This motion is made following a meet and confer between counsel pursuant to L.R. 7-3, which took place on November 5, 2025. On October 28, 2025, counsel for Defendants reached out to all counsel previously listed on this Court's case documents to schedule a meet and confer consistent with the Court's L.R. 7-3. Plaintiffs' counsel were not able to meet on either October 31 or November 3, as proposed by Defendants, and thus the conference was ultimately scheduled for November 5, 2025. At that meet and confer, Defendants expressed their intent to file the instant motion seeking termination of the previously entered permanent injunction based on intervening changes of law and fact. Plaintiffs did not offer a substantive response to the issues raised by Defendants at that time, or subsequently, when counsel for Defendants followed-up regarding their position. Instead, in an email sent on November 10, 2025, Plaintiffs requested Defendants add the following text with respect to their position on Defendants' filing of this underlying motion: "Plaintiffs were only informed on November 5[, 2025] of the government's intent to extinguish the injunction entered in *Perez-Funez* four decades ago. This is the first time we heard that the government believed such action was appropriate other than the request for a Meet and Confer on that date. We requested a follow up Meet and Confer for next Wednesday, [November 19, 2025] but that was denied. As such, we oppose the filing of a Rule 60B motion."

iv

## MOTION TO TERMINATE PERMANENT INJUNCTION AND ADVISAL ORDER

Defendants move to terminate this Court's injunction and this Court's later Order Re Advisal under Federal Rules of Civil Procedure 60(b)(4), (b)(5), and (b)(6). In light of the significant changes in circumstances since this court entered the injunction 40 years ago, including promulgation of substantial changes to the nation's immigration laws, and Supreme Court precedent, further continuation of the injunction and its specific advisal language is no longer equitable or in the public interest. The injunction's class-wide relief is also directly contrary to 8 U.S.C. § 1252(f)(1), as well as the Supreme Court's decision in *Garland v. Aleman Gonzalez*, 596 U.S. 543 (2022). Pursuant to Federal Rules of Civil Procedure 60(b)(4), (b)(5) and (b)(6), Defendants thus move to dissolve the Court's injunction and this Court's later advisal order.

This motion is based upon the above Notice, the accompanying Memorandum of Points and Authorities, all pleadings and papers on file in this action, and such other matters as may be presented to this court at the time of the hearing on the motion. Pursuant to Local Rule 7-15, Defendants do not waive oral argument.

v

DATED: November 12, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

DREW C. ENSIGN
Deputy Assistant Attorney General
Civil Division

WILLIAM C. SILVIS
Assistant Director

KRISTEN GIUFFREDA
PATRICK GLEN
MICHAEL CELONE
Senior Litigation Counsel

*s/ Zachary Cardin*
ZACHARY CARDIN
Trial Attorney
United States Department of Justice
Office of Immigration Litigation – General
Litigation and Appeals Section
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
202-802-3410
zachary.a.cardin@usdoj.gov

*Attorneys for Defendants*

vi

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendants respectfully move this Court pursuant to Federal Rules of Civil Procedure 60(b)(4), 60(b)(5), and 60(b)(6) for an order terminating the permanent injunction entered in this action on September 30, 1985 (Dkt. No. 226, reported at 619 F. Supp. 656) and dissolution of the Court's later Order Re Advisal (Dkt. No. 240).

## INTRODUCTION

Forty years ago, this Court issued a permanent injunction based on its finding that the Immigration and Naturalization Service's (INS) then-existing procedures for offering voluntary departure to unaccompanied minors violated the Fifth Amendment's Due Process Clause. *Perez-Funez v. INS*, 619 F. Supp. 656 (C.D. Cal. 1985). The Court found the process "inherently coercive" and concluded that unaccompanied minors could not provide a knowing and intelligent waiver of their rights. *Id.* at 662. To remedy this, the Court fashioned its own prophylactic procedural safeguards, culminating in the 1986 "Order Re Advisal" (Dkt. No. 240) that mandated that unaccompanied minors be presented with a specific, court-approved advisal (now Form I-770) before being given the opportunity to voluntarily return to their country of origin, and that the unaccompanied minor also be given certain access to telephones to contact a parent, relative, or lawyer.

Federal courts issuing injunctive relief in institutional reform cases have a duty "to ensure that 'responsibility for discharging the [government's] obligations is returned promptly to the [government] and its officials' when the circumstances warrant." *Horne v. Flores*, 557 U.S. 433, 450 (2009). "[T]he longer an injunction or consent decree stays in place, the greater the risk that it will improperly interfere with [government's] democratic processes." *Id.* at 453. Indeed, prolonged enforcement of injunctions "may 'improperly deprive future officials of their designated legislative and executive powers.'" *Id.* at 450 (citation omitted). The

1

Supreme Court has thus admonished lower courts considering Rule 60 motions to ascertain whether ongoing enforcement of the original order "[i]s supported by an ongoing violation of federal law" and not to focus on compliance with "the original order." *Id.* at 454.

These principles apply with even greater force to the federal government, especially to its enforcement of immigration laws: the Judiciary must not intrude into the authority of the Executive in one of its core foreign relations functions with indefinite oversight and micromanagement. *See Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 n.18 (1977); *see also Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952).

Here, applying those standards, relief is warranted under Federal Rule of Civil Procedure 60(b) on three independent grounds. To start, the Supreme Court in *Garland v. Aleman Gonzalez*, 596 U.S. 543 (2022), clarified that 8 U.S.C. § 1252(f)(1) divests district courts of jurisdiction to enter a class-wide injunction restraining certain aspects of the Executive Branch's operation of certain provisions of the Immigration and Nationality Act (INA). The *Perez-Funez* injunction is precisely such an order, as it dictates the specific procedures Defendants must follow—procedures found nowhere in the INA—before they may "carry out" the voluntary departure statute. That alone requires the Court to dissolve the class-wide injunction.

Second, prospective application is inequitable because there has been a "significant change … in law." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 384 (1992). In 1996, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act, PL 104-208 Div. C, 110 Stat. 3009 (1996) ("IIRIRA"), which limited judicial review and eliminated the distinction between "exclusion" and "deportation" proceedings. 8 U.S.C. §§ 1229a, 1252. In 2008, Congress passed the William Wilberforce Trafficking Victims Protection

2

Reauthorization Act of 2008 (TVPRA), Pub. L. No. 110-457, which created a new, detailed, and binding statutory framework for processing unaccompanied alien children (UAC). This framework, codified at 8 U.S.C. § 1232, supersedes this Court's 1985 due process analysis. The TVPRA creates a bifurcated system—one for certain UAC from contiguous countries (Mexico and Canada) and one for all other UAC—that closes the gaps motivating this court's injunction in the first place.

Third, this injunction is a prime example of the institutional reform decrees the Supreme Court has repeatedly warned against. It represents a "substantial intrusion" by the Judiciary into the core Executive function of immigration enforcement. *See Arlington Heights*, 429 U.S. at 268, n.18. For forty years, this injunction has "improperly deprive[d] future officials of their designated legislative and executive powers" to adapt immigration policy to "changing political and economic circumstances." *Id.* at 449; *Mathews v. Diaz*, 426 U.S. 67, 81 (1976).

The legal and factual landscape governing asylum and related protections has also changed dramatically over the proceeding four decades. The injunction now operates in a fundamentally different system—one that Congress and the Executive Branch have reshaped through successive reforms, culminating in the legislation commonly referred to as the "One Big Beautiful Bill."

**BACKGROUND**

**A. The Court's 1985 Decision and 1986 Implementing Order**

In 1981, Plaintiffs, predominantly Salvadoran teens, sought nationwide injunctive relief on behalf of a class of unaccompanied alien minors alleging that the INS's implementation of the then-governing voluntary departure statute, 8 U.S.C. § 1254, *repealed*, Pub. L. 104-208, Div. C, Title III, § 308(b)(7), Sept. 30, 1996, 110 Stat. 3009-615, violated their right to due process of law. Plaintiffs claimed that unaccompanied minors apprehended during border encounters and elsewhere were, at best, provided no explanation of their rights and the voluntary departure

3

procedure, or at worst, coerced into signing voluntary departure forms, thereby waiving their opportunity for a hearing before an immigration judge in deportation or exclusion proceedings. *Perez-Funez v. District Director,* 619 F. Supp. 656, 658 (C.D. Cal. 1985).

After a trial on the merits, the Court found that INS's policy implementing voluntary departure procedures, which differed depending on the unaccompanied minor's age-range and whether the child's permanent residence was in a contiguous country, was undertaken in "good faith," and indeed, Plaintiffs' allegations of coercion were "unfounded." 619 F. Supp. at 661. The Court observed that the INS performs "a thankless task under adverse conditions, and by and large, performs it admirably." *Id.* Nevertheless, the Court also concluded that the unaccompanied minors uniformly expressed a "lack of understanding," even in situations "where they had read, or had read to them, the notices and advisals" regarding the selection of voluntary departure and waiver of the opportunity for a hearing in deportation proceedings. *Id.* The Court found that the unaccompanied minors "generally do not understand the concept of legal rights without explanation," especially when presented in a stressful environment, separated from their family and familiar culture; they are unable to make "a knowing and voluntary choice" and instead, "the natural tendency is to defer to the authority before them[.]" *Id.*

The Court found lesser risk of deprivation of rights through an unknowing waiver in sub-groups of the class consisting of children who permanently reside in Mexico or Canada, and in children younger than fourteen who are arrested in the interior of the country and/or are not residents of contiguous countries based on INS's policy of locating a relative or friend to act as a representative. 619 F. Supp. at 662. Nonetheless, the Court found the risk of erroneous deprivation "great," especially with respect to "class members who are not arrested near the border or are

4

not permanent residents of Mexico or Canada, and concluded that then-current procedures "d[id] not address the problem adequately." *Id.* at 663.

Considering additional or substitute procedures under the *Matthews v. Eldridge,* 424 U.S. 319, 335 (1976) balancing test, *see* 619 F. Supp. 664-65, the Court observed that INS "d[id] not object to a simplified advisal which is legally accurate," but determined that written advisals alone were "insufficient to apprise class members of their rights." *Id.* at 664. Indeed, the Court viewed "access to telephones prior to presentation of the voluntary departure form [as] the only way to ensure a knowing waiver." *Id.* Despite the "good faith" of the INS agents, due to their inherently adversarial position in relation to the unaccompanied minors, "contact with a third party is necessary" and in many cases, contact with a parent or relative would remove the child from the status of "unaccompanied." *Id.* at 665. The Court further noted that with respect to class members apprehended at or near the border, who are not residents of Mexico or Canada, "*mandatory* contact with either counsel, a close relative, or friend, *prior* to presentation of the voluntary departure form is central to the success of the telephone [procedure]," because otherwise the evidence demonstrated these children would "commit an unknowing and involuntary waiver." *Id.* (emphasis in original).

With regard to unaccompanied minors who are residents of Mexico and Canada, who have a "better understanding" of immigration laws and "for the most part, desire to return voluntarily," the Court found that mandatory notification of the opportunity to make a call to a relative, close friend, or legal organization was sufficient to prevent the risk of unknowing waivers in the great majority of cases. 619 F. Supp. at 666. Finally, the Court determined that updated, accurate lists of legal services were a "necessary concomitant of a telephone access program." *Id.*

In light of the foregoing, the Court entered a permanent injunction mandating five different procedural changes. *First*, the injunction requires that the INS provide

5

class members "a simplified rights advisal consistent with the current law of this circuit" along with "the free legal services list complied pursuant to 8 C.F.R. § 292a.1." *Second*, with respect to class members apprehended in the immediate vicinity of the border and who are permanent residents of Mexico or Canada, the injunction requires that the INS inform the class member that they may make a telephone call to a parent, relative, friend, or organization on the legal services list. The class member must be so informed prior to presentation of the voluntary departure form. *Third*, with respect to all other class members, the injunction requires that the INS "shall provide access to telephones" and ensure that the class has in fact communicated with a parent, relative, friend, or organization on the legal services list prior to presentation of the voluntary departure form. *Fourth*, the injunction requires that the INS shall obtain signed acknowledgement on a separate copy of the simplified rights advisal form showing that the INS has provided all notices and required information. Finally, the injunction requires the INS to update and maintain the free legal services list. 619 F. Supp. at 670.

On May 16, 1986, the Court issued a further "Order re Advisal" mandating the specific contents of the simplified advisal of rights the INS was required to provide to unaccompanied minors. Dkt. No. 240. This Court-mandated advisal became Form I-770, which is still in use today. *See Attached Exhibit A.* Although the form has had several additions over the years (including by the Department of Homeland Security) in an attempt to remain compliant with current law, *see, e.g.,* 63 F.R. 39759; 83 F.R. 45486, the Court's original requirements have in large part remained set in stone even though they no longer reflect the current statutory scheme or areas of agency responsibilities.

**B. Intervening Statutory and Regulatory Developments**

Since the injunction was issued in this case forty years ago, there have been significant changes in immigration law bearing directly on UAC—the very group to

6

which the injunction applies. These include the Immigration Act of 1990, Pub. L. No. 101–649 § 408, 104 Stat. 4978, and IIRIRA. A major objective of IIRIRA was to "protec[t] the Executive's discretion" from undue interference by the courts; indeed, "that can fairly be said to be the theme of the legislation." *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 486 (1999). Among other things, IIRIRA eliminated the distinction between "exclusion" and "deportation" proceedings.

IIRIRA also introduced a statutory limit to the amount of time allowed for voluntary departure, authorizing a maximum of 120 days if voluntary departure is granted prior to or at the beginning of removal proceedings, and 60 days if voluntary departure is granted at the conclusion of removal proceedings. INA § 240B, 8 U.S.C. § 1229c.

Particularly relevant here, in 2002, Congress passed the Homeland Security Act (the "HSA"), Pub. L. No. 107-296, 116 Stat. 2135. Prior to the passage of the HSA, the INS had enforced federal immigration law, including as to minors. *See, e.g., Perez-Funez*, 619 F. Supp. 656, 658. But the HSA dismantled the INS and transferred some of its functions—specifically those "with respect to the care of unaccompanied alien children"—to the U.S Department of Health and Human Services (HHS). Homeland Security Act of 2002, Pub. L. No. 107-296, § 462(a), 116 Stat. 2135, 2202; *see also City of Chicago v. Barr*, 961 F.3d 882, 888 n.1 (7th Cir. 2020). Unlike in 1985, HHS, Office of Refugee Resettlement (ORR) is now "responsible for" ensuring that the "interests" of UAC are considered in decisions about UAC's "care and custody." 6 U.S.C. § 279(b)(1)(B). ORR is also responsible for "reuniting unaccompanied alien children with a parent abroad in appropriate cases." *Id.* § 279(b)(1)(H).

In 2008, Congress addressed the processing and care and custody of UAC by passing the TVPRA. *See* Pub. L. No. 110-457, 122 Stat. 5044. In order to "enhanc[e]

7

efforts to combat the trafficking of children," *id.* § 235, Congress instructed the heads of several agencies to "develop policies and procedures" ensuring "that unaccompanied alien children" are "safely repatriated to their country of nationality or of last habitual residence," 8 U.S.C. § 1232(a)(1).

Moreover, the TVPRA includes provisions for the "safe repatriation" of UAC. 8 U.S.C. § 1232(a)(5). The TVPRA provides that certain UAC from contiguous countries may be permitted to withdraw their application for admission pursuant to 8 U.S.C. § 1225(a)(4) and voluntarily return to their country of nationality or residence. 8 U.S.C. § 1232(a)(2)(A)-(B). When the Department of Homeland Security seeks to "remove[]" from the United States "[a]ny unaccompanied alien child" from a non-contiguous country (a country other than Canada and Mexico) or a UAC from a contiguous country not permitted to withdraw, the child must be "placed in removal proceedings under" 8 U.S.C. § 1229a. *See* 8 U.S.C. § 1232(a)(5)(D)(i).[1] The TVPRA also makes UAC in section 1229a removal proceedings eligible for voluntary departure under 8 U.S.C. § 1229c "at no cost to the child." *Id.* § 1232(a)(5)(D)(ii). That provision authorizes the Attorney General to "permit an alien voluntarily to depart the United States … prior to the completion of [§ 1229a removal] proceedings." *Id.* § 1229c(a)(1). In addition, the Attorney General may do the same if the alien meets certain eligibility criteria after removal proceedings conclude if "the immigration judge enters an order granting voluntary departure." *Id.* § 1229c(b)(1). And the TVPRA directs that a UAC whom DHS seeks to remove must receive "access to counsel" to "the greatest extent practicable." *See* 8 U.S.C. § 1232(a)(5)(D)(iii), (c)(5). This directive calls for counsel "to represent"

---

[1] The TVPRA excludes UAC from the expedited removal process. *Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 618 (D.C. Cir. 2020).

8

the UAC "in legal proceedings" and, more broadly, to "protect them from mistreatment, exploitation, and trafficking." *Id.* § 1232(c)(5).

Several regulations implement these statutory provisions. UAC must "be treated with dignity, respect, and special concern for their particular vulnerability." 45 C.F.R. § 410.1003(a). ORR also has specific "responsibilities" when it comes to providing "legal services for unaccompanied children." 45 C.F.R. § 410.1309(a)(1). For instance, ORR must offer information about the "child's right to a removal hearing before an immigration judge," his "ability to apply for asylum," and the option of "request[ing] voluntary departure in lieu of removal." *Id.* § 410.1309(a)(2)(iv). UAC in ORR's custody, moreover, must receive a "confidential legal consultation with a qualified attorney" to "determine possible forms of relief from removal." *Id.* § 410.1309(a)(2)(v).

Most recently, the One Big Beautiful Bill Act, Pub. L. No. 119-21, 139 Stat. 72 (2025) (hereinafter, "OBBB"), enacted changes to the law that affect UAC. The OBBB expands DHS's authority to permit UAC from any country, not just contiguous countries, to withdraw their application for admission pursuant to 8 U.S.C. § 1225(a)(4) and provides funds to DHS for such withdrawals. OBBB § 100051(8)(B), (C).

## STANDARD OF REVIEW

"Pursuant to Rule 60(b)(4), a litigant may attack a judgment as void due to lack of subject matter jurisdiction." *Wages v. IRS*, 915 F.2d 1230, 1234 (9th Cir. 1990).

Rule 60(b)(5) provides that a court "may relieve a party ... from a final judgment, order, or proceeding" when "the judgment has been satisfied, released, or discharged" or when "applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). The Supreme Court has explained that the disjunctive language of Rule

9

60(b)(5) clarifies that each of these grounds for relief is "independently sufficient." *Horne*, 557 U.S. at 454.

In contrast, the "equitable" clause allows "a court to modify or vacate a judgment or order if a significant change either in factual conditions or in law renders continued enforcement detrimental to the public interest." *Id.* at 447 (internal quotation marks omitted).

When determining whether to vacate an injunction, courts must consider "whether ongoing enforcement of the original order [is] supported by an ongoing violation of federal law." *Id.* at 454. Further, if the government has implemented a "durable remedy," judicial oversight should cease. *Id.* at 450. Rule 60(b)(5) also permits a court to modify a decree if the modification is "suitably tailored" to resolve problems created by changed circumstances. *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 383 (1992). Once a party carries its burden to show that changed circumstances warrant relief from an injunction, "a court abuses its discretion when it refuses to modify an injunction or consent decree in light of such changes." *Horne*, 557 U.S. at 447 (internal quotations and citation omitted).

Rule 60(b)(6) permits relief from judgment for "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6). The rule permits the district court to vacate judgments "'whenever such action is appropriate to accomplish justice.'" *Henson v. Fid. Nat'l Fin., Inc.*, 943 F.3d 434, 443–44 (9th Cir. 2019) (quoting *United States v. Sparks*, 685 F.2d 1128, 1130 (9th Cir. 1982)). Relief under the rule is available only in "extraordinary circumstances." *Buck v. Davis*, 580 U.S. 100, 123 (2017). But "[i]n determining whether extraordinary circumstances are present, a court may consider a wide range of factors," such as "'the risk of injustice to the parties' and 'the risk of undermining the public's confidence in the judicial process.'" *Id* (quoting *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 864 (1988)).

10

## ARGUMENT

## I.    Dissolution of the Class-Wide Injunction Is Required Under § 1252(f) and the Supreme Court's Intervening Decision in *Aleman Gonzalez*.

Rule 60(b) relief is warranted with respect to the Court's injunction and mandated advisal because this Court lacks jurisdiction to enjoin Defendants under 8 U.S.C. § 1252(f)(1). The Supreme Court's decision in *Garland v. Aleman Gonzalez*, 596 U.S. 543 (2022), has resolved any doubt that § 1252(f)(1) divests this Court of jurisdiction to restrain the operation of particular provisions in the INA governing a UAC's voluntary return to their country of origin. Relief is thus warranted under Rule 60(b)(4) because the injunction is void for lack of jurisdiction, or at minimum under Rule 60(b)(5) due to a change in law. Indeed, "[a] court errs [under Rule 60(b)(5)] when it refuses to modify an injunction or consent decree in light of" "changes in either statutory or decisional law." *Agostini v. Felton*, 521 U.S. 203, 215 (1997).

8 U.S.C. § 1252(f)(1) states that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation" of certain provisions of the INA, "other than with respect to the application of such provisions to an *individual* alien." In 2022, the Supreme Court held that "§ 1252(f)(1) generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Aleman Gonzalez*, 596 U.S. at 550. The *Aleman Gonzalez* court went on, arguing that "injunctive relief on behalf of an entire class of aliens is not allowed because it is not limited to remedying the unlawful 'application' of the relevant statutes to 'an individual alien.'" *Id.* at 551.

The *Perez-Funez* injunction is precisely the type of class-wide order that § 1252(f)(1) and *Aleman Gonzalez* forbid. It is a class-action injunction that "restrain[s] the operation" of the INA—specifically, the provisions relating to

11

voluntary departure (8 U.S.C. § 1229c) and the processing of aliens for withdrawal of their application for admission (8 U.S.C. § 1225(a)(4))—all parts of the INA to which § 1252(f)(1) applies. *See Galvez v. Jaddou*, 52 F.4th 821, 830 (9th Cir. 2022) (explaining that the covered provisions include 8 U.S.C. §§ 1221–1231 and 1252–1254a). It does so by imposing affirmative, extra-statutory procedural hurdles that Defendants must clear before they can "carry out" the voluntary departure provisions for any member of the plaintiff class. The 1986 Order Re Advisal, which mandates the precise language that must be used when informing UAC of their right to removal proceedings and a mandatory telephonic access policy, is a quintessential example of a court ordering federal officials to refrain from taking actions to carry out the INA as written.

Because the processing of UAC by Defendants occurs pursuant to provisions governed by § 1252(f)(1), *Aleman Gonzalez* makes plain that this Court lacks jurisdiction to maintain its permanent class-wide injunction. This Court did not have the benefit of the Supreme Court's clarification on the scope of § 1252(f)(1) when it issued its injunction in 1985 and its advisal in 1986. But it must account for that development now, *see Agostini*, 521 U.S. at 215, especially because the changes implicate the court's jurisdiction. Under *Aleman Gonzalez*'s construction of § 1252(f)(1), this Court must dissolve the class-wide injunction in this matter.[2] *See* Fed. R. Civ. P. 60(b)(4), 60(b)(5).

---

[2] Defendants acknowledge the statute's exception for "the application of such provisions to an individual alien against whom proceedings . . . have been initiated." 8 U.S.C. § 1252(f)(1). While this provision would not, by its terms, bar relief originally granted to the *named plaintiffs* as "individual aliens," any claim to maintain the injunction as to them is moot. The named plaintiffs were defined by their immigration status as unaccompanied minors at the time of the original complaint's filing over four decades ago, but they are no longer unaccompanied minors today. Because the injunction and its advisal requirements apply exclusively

12

II.   **Termination of the Injunction Is Warranted Because Prospective Application Is No Longer Equitable**

Even setting aside § 1252(f)(1), the injunction must be terminated under Rule 60(b)(5) because "applying it prospectively is no longer equitable." In the forty years since this Court's 1985 injunction, the substantive merits have been displaced by Congress's own comprehensive changes to the immigration laws affecting the minors at issue in the certified class—specifically, the TVPRA and OBBB—as well as regulatory changes that address the Court's original concerns. As a result, the continued enforcement of the injunction would represent an intolerable and ongoing violation of the separation of powers, where a federal court is mandating additional, stale procedures that conflict with more recent statutory enactments. To be clear, the Government intends to continue to provide an advisal to UAC if the injunction is lifted, but the Government will adapt the form to incorporate these legal and factual developments.

**A. Maintaining the Injunction Is No Longer Equitable Because Significant Changes in Immigration Law and Regulation Have Materially Altered the Legal Landscape**

The immigration laws have changed profoundly since the order in this case was entered, especially regarding the rights and advisals for UAC, rendering continuation of the injunction inequitable. In 1985, this Court intervened to fill a perceived due process void in the processing of unaccompanied minors. Over the subsequent course of forty years, however, that void has otherwise been filled by various statutory and regulatory enactments which obviate whatever need there was

to the processing of UACs, there is no remaining legal or factual basis to maintain the Court's order, even as to the original individual parties.

13

for the Court's 1985 order while creating a dramatically different legal landscape where that order no longer accurately distills the rights and consequences at issue.

First, in 2008, Congress enacted the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), creating a detailed, comprehensive, and binding statutory scheme governing UAC. *See* 8 U.S.C. § 1232. For instance, the TVPRA addresses the circumstances under which UAC from non-contiguous countries may be permitted to return to their home country.

Under 8 U.S.C. § 1232(a)(2), UAC from contiguous countries (Mexico and Canada) *may* be permitted to withdraw their application for admission under 8 U.S.C. § 1225(a)(4) and return to their country of origin, but only *after* they are screened by federal agents for trafficking concerns, to determine if they have a fear of return, and to assess whether the child is able to make an independent decision to withdraw their application for admission. 8 U.S.C. § 1232(a)(2)(A)(i)-(iii). The withdrawal process takes place prior to the filing of the Notice to Appear (NTA). By contrast, under 8 U.S.C. § 1232(b)(3), UAC from non-contiguous countries (*e.g.*, El Salvador), and UAC from contiguous countries who do not withdraw their application for admission, must be transferred to the custody of HHS within 72 hours of determining the child is a UAC, absent exceptional circumstances. UAC whom DHS seek to remove, are placed in removal proceedings under 8 U.S.C. § 1229a, and may request voluntary departure under 8 U.S.C. § 1229c. *See* 8 U.S.C. § 1232(a)(5)(D)(i)-(ii). For those UAC who are transferred to HHS, the TVPRA also provides access to counsel to "the greatest extent possible," for UAC in removal proceedings, *see* 8 U.S.C. § 1232(a)(5)(D)(iii), (c)(5), while aiming to protect UAC "from mistreatment, exploitation, and trafficking," 8 U.S.C. § 1232(c)(5). The voluntary departure process takes place after the filing of the NTA.

Second, the Unaccompanied Children Program Foundational Rule, 45 C.F.R. § 410.1309, provides further protection to UAC while implementing key provisions

14

of the TVPRA. UAC must receive certain information regarding rights to a hearing before an immigration judge, to apply for asylum, and to request voluntary departure in lieu of removal proceedings, as well as confidential consultations with a qualified attorney to discuss these and other issues. *See generally* 45 C.F.R. § 410.1309(a)(1), (2).

Finally, the OBBB, expanded the authority to permit certain UAC to withdraw their application for admission and return to their home country to UAC from *any* country, not just contiguous ones. *See* OBBB § 100051(8), 8 U.S.C. § 1232(a)(2)(A)-(B). Under the OBBB, withdrawal is permissible where a UAC is not a victim of any form of severe trafficking in persons and otherwise lacks a fear of persecution in the country of nationality or last habitual residence. *See* OBBB § 100051(8).

Given these changes since 1985, the *Perez-Funez* permanent injunction is antiquated and no longer equitable under present circumstances. On one hand, it is no longer necessary given congressional and regulatory enactments designed to protect the interests of UAC, including through the TVPRA and the Foundational Rule. On the other, the injunction makes little equitable sense since the legal landscape in which it was entered has been displaced by the substantive provisions of the TVPRA and the OBBB.

In light of the key provisions of the TVPRA and the Foundational Rule, the injunction is therefore no longer necessary to safeguard the interests of UAC. The operative provisions of the TVPRA ensure that voluntary departure is considered and granted by an immigration judge in removal proceedings who can advise the UAC of the consequences of this form of relief. 8 U.S.C. § 1232(a)(5)(D)(i)-(ii). These statutorily and regulatorily provided safeguards more than resolve the concerns that animated the permanent injunction. *Compare* 8 U.S.C. § 1232, 45 C.F.R. § 410.1309 (laying out these procedures and rights), *with* Dkt. No. 240 (Order

re Advisal) (providing nearly identical requirements); *Perez-Funez,* 619 F. Supp. at 670 (same). There is thus no reason to keep the injunction in place.

Moreover, this Court's injunction and the advisals it requires are no longer accurate given the changes to UAC processing made by both the TVPRA and the OBBB. Regarding UAC from non-contiguous counties, the very group represented by the original Salvadoran plaintiffs, the injunction requires advisals as to rights that are inconsistent with the current state of law. The 1985 injunction was designed to ensure a knowing waiver of a deportation hearing *before* voluntary departure. But under the TVPRA, as discussed above, voluntary departure available to UAC appearing before an immigration judge, and thus in an entirely different posture that eliminates the concerns motivating the injunction. *See* 8 U.S.C. § 1232(a)(5)(D). And contrary to the more limited options available to remove or repatriate UAC in 1985, the TVPRA and OBBB provide the ability for UAC to withdraw their application for admission before being placed into removal proceedings. 8 U.S.C. § 1232(a)(2)(A)-(B); OBBB § 100051(8). These authorities provide their own protections for UAC, and permit withdrawal of the UAC's application for admission and repatriation only so long as certain conditions are met, including that the UAC is screened to determine that he is not a victim of specified trafficking, does not fear harm in his or her country of nationality, and is able to make a voluntary decision to withdraw his application for admission. The injunction thus forces Defendants to provide a complex advisal about a legal option that is now unavailable to UAC (voluntary departure outside of removal proceedings), while simultaneously omitting critical information about the *actual* procedural pathway for UAC.

In light of the TVPRA, the Court's 40-year-old injunction improperly "substitute[s the court's] ... policy judgments for those of the ... officials to whom such decisions are properly entrusted." *Horne,* 557 U.S. at 455. Under *Horne,* the

16

TVPRA is an important change during the intervening years that fulfills the government's obligations "by other means." *Id.* at 439.

The equitable purpose of this court's injunction was to ensure accurate and comprehensible notice to UAC before they accepted voluntary departure, not to effectively freeze court-imposed procedures despite subsequent changes to the governing immigration law—through Congress's promulgation of the TVPRA and the OBBB, and HHS's Foundational Rule. Continued enforcement of the framework established by the injunction, which now omits existing statutory rights and obligations and provides inaccurate information, is no longer equitable, *see Rufo*, 502 U.S. at 384, and risks undermining the very fairness the Court sought to protect. Indeed, maintaining an advisal system premised on the outdated injunction risks denying minors the very understanding the injunction was intended to guarantee.

**B. Maintaining the Injunction Is No Longer Equitable Because Subsequent Factual Developments Render the Injunction Severely Outdated**

This Court's injunction rests on outdated assumptions about unaccompanied minors, border processing, and communication that no longer exist. The factual landscape that once justified the injunction has fundamentally changed, and continued adherence to it now frustrates, rather than advances, the goal of ensuring that children understand their rights.

The Form I-770 no longer serves as an effective or realistic method of advisal; its structure assumes that an apprehending officer can advise a child of their rights through a short, one-time conversation and that a notice will meaningfully convey those rights. It provides no interactivity, no opportunity to verify understanding, and no mechanism to account for language barriers or literacy limitations. Agencies now have the technological capacity to deliver information in multimedia formats,

17

through videos and digital materials provided in a child's language of fluency. Yet the injunction rigidly ties the government to a single, outdated method: a form conceived when fax machines were novel inventions, international communication were slow and expensive, and the Internet did not even exist.

Moreover, the injunction was entered under the assumption that unaccompanied minors were apprehended in relatively small numbers, processed individually, provided a one-time advisal of rights, and required to make a decision about taking voluntary departure while in law enforcement custody. These assumptions are no longer the reality. Today UAC arrive in the United States in unprecedented volumes, moving rapidly between facilities, and transferred to child-friendly facilities in HHS custody with significant protections at the time they are placed into removal proceedings. The linear individualized model envisioned by the injunction is no longer the operational reality; and the form, as a result, cannot accommodate the complexities of modern intake operations.

What is more, the substantial changes in immigration law—outlined above—likewise compound the operational changes at issue here. IIRIRA introduced substantial changes to immigration law, including stricter admissibility standards, new bars to adjustment of status, and updated rules for unlawful presence.

The Homeland Security Act further transformed the immigration landscape by creating the DHS and transferring responsibilities from the former INS to DHS components such as CBP, USCIS, and ICE. The I-770 continues to reference obsolete agency structures and procedures, potentially confusing applicants and leading to administrative errors. Beyond naming conventions, the Act introduced new procedural mechanisms—centralized recordkeeping, interagency information sharing, and updated adjudication protocols—that are entirely absent from the form. Consequently, the I-770 cannot facilitate compliance with modern DHS procedures.

18

The TVPRA then significantly expanded protections for survivors of human trafficking, particularly minors, by establishing new procedural safeguards and specialized services.

And most recently, the OBBB enacted sweeping updates to filing procedures, and fee structures. It also introduced targeted provisions addressing vulnerable populations and special categories of applicants, reflecting contemporary legislative priorities.

Because the I-770 predates these reforms, it fails to account for these changes, leaving UAC applicants for admission without guidance on compliance with current procedural and substantive requirements. Taken together, these laws and administrative changes fundamentally alter the legal, factual, and procedural landscape surrounding the I-770. The form is therefore no longer a reliable instrument, underscoring the need for updated documentation that accurately reflects modern immigration law and practice.

## C. Maintaining the Injunction Is No Longer Equitable Because It Perpetually Entangles the Judiciary in Core Executive Functions.

This 40-year injunction is a "substantial intrusion" into the workings of the political branches. *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268, n.18 (1977). Institutional reform decrees raise "sensitive federalism concerns," *Horne*, 557 U.S. at 448, and those concerns are heightened in the area of immigration where the federal government must be able to adapt to changing circumstances. *Mathews v. Diaz*, 426 U.S. 67, 81 (1976).

"For more than a century," the Supreme Court has held that immigration policy is a "fundamental sovereign attribute" of the Legislative and Executive Branches and "largely immune from judicial control." *Trump v. Hawaii*, 585 U.S. 667, 702 (2018) (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)). The

19

"responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches," *Reno v. Flores*, 507 U.S. 292, 305 (1993), because immigration policy involves "changing political and economic circumstances" and "may implicate 'relations with foreign powers,'" judgments that "are frequently of a character more appropriate to either the Legislature or the Executive." *Mathews*, 426 U.S. at 81; *Trump*, 585 U.S. at 702 (citations omitted). For these reasons, "any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952).

This injunction, however, "improperly deprive[s] future officials of their designated legislative and executive powers." *Horne*, 557 U.S. at 450. It freezes a specific procedural element of immigration enforcement in 1986, a period quite unrecognizable from the circumstantial and legislative changes made in the forty years hence. Yet, this court's injunction removes from the Executive Branch the power to respond to such factual and legal changes, and thus runs counter to bedrock separation of powers principles. The Supreme Court has warned that the "longer an injunction … stays in place, the greater the risk that it will improperly interfere with a [government's] democratic processes." *Id.* at 453. After nearly four decades, that risk has been fully realized.

What's more, the "public interest is a particularly significant reason for applying a flexible modification standard," *Rufo*, 502 U.S. at 381, and the public interest is best served by this Court's termination, or in the alternative, amendment to its injunction and advisal order. This case presents the "extraordinary circumstances" that justify relief under Rule 60(b)(6). *See Ackermann v. United States*, 340 U.S. 193, 198 (1959). The "incessant command of the court's conscience that justice be done in light of all of the facts," *Bankers Mortgage Co. v. United States*, 423 F.2d 73, 77 (5th Cir. 1970), requires this Court to recognize that its 1985

20

order, while well-intentioned, is no longer equitable and stands as an obstacle to the current, democratically-enacted immigration framework. "Responsibility for discharging the government's obligations must be returned promptly to the government and its officials." *Horne*, 557 U.S. at 448.

The power to administer and enforce the immigration laws—including responding to changes in immigration trends and factual circumstances—rests in the Executive Branch and its agencies. The injunction, however, inhibits the Executive from exercising this authority. Current immigration policies to limit unlawful entry further justify termination of the injunction. Immigration policy by definition involves "changing political and economic circumstances," making such them particularly appropriate for political maintenance and control. *Mathews*, 426 U.S. at 81. A "significant change" in factual circumstances or law "renders the continued enforcement of the judgment detrimental to the public interest." *Horne*, 557 U.S. at 447 (quoting *Rufo*, 502 U.S. at 384). And such significant changes in circumstances are present here.

The Court should thus dissolve the injunction because it is the very type of institutional-reform injunction that the Supreme Court cautioned against: it interferes with the government's exercise of constitutional powers to develop new policies to address the changes in immigration to the United States. At base, the injunction removes from the Executive the power to respond to new foreign-relations concerns and places that power in the hands of the Judiciary, contrary to bedrock separation of powers principles.

Consequently, in view of the changed circumstances, the Court should terminate the injunction.

## CONCLUSION

For the foregoing reasons, Defendants request that this Court terminate the injunction as to the class.

21

DATED: November 12, 2025          Respectfully submitted,

                                  BRETT A. SHUMATE
                                  Assistant Attorney General

                                  DREW C. ENSIGN
                                  Deputy Assistant Attorney General
                                  Civil Division

                                  WILLIAM C. SILVIS
                                  Assistant Director

                                  ZACHARY A. CARDIN
                                  Trial Attorney

                                  KRISTEN GIUFFREDA
                                  PATRICK GLEN
                                  MICHAEL CELONE
                                  Senior Litigation Counsel

                                  *s/ Zachary Cardin*
                                  ZACHARY CARDIN
                                  Trial Attorney
                                  United States Department of Justice
                                  Civil Division
                                  Office of Immigration Litigation
                                  P.O. Box 868, Ben Franklin Station
                                  Washington, DC 20044
                                  (202) 802-3410
                                  Zachary.a.cardin@usdoj.gov
                                  Attorneys for Defendants

22

## CERTIFICATION OF COMPLIANCE WITH TYPE-VOLUME LIMITATION PURSUANT TO LOCAL RULE 11-6.1.

The undersigned, counsel of record for Defendants, certifies that this brief contains 6362 words, which:

_X_ complies with the word limit of L.R. 11-6.1.

___ complies with the word limit set by court order dated [date].

Dated:  November 12, 2025                 s/ Zachary Cardin

                                          ZACHARY CARDIN

                                          Trial Attorney

23

## PROOF OF SERVICE BY MAILING

I am over the age of 18 and not a party to the within action.  I am employed by the Office of United States Attorney, Central District of California, and am readily familiar with the practice of this office for collection and processing collection and mailing.  My business address is 300 North Los Angeles Street, Suite 7516, Los Angeles, California 90012.

On **November 12, 2025**, I served: **DEFENDANT'S MOTION TO TERMINATE PERMANENT INJUNCTION AND ADVISAL ORDER** persons or entities named below by enclosing a copy in a sealed envelope with postage fully prepaid and addressed as shown below and placing the envelope for collection and mailing with the United States Postal Service on the date and at the place shown below following our ordinary office practices.

Date of mailing: **November 12, 2025**.  Place of mailing: Los Angeles, California. Person(s) and/or Entity(s) To Whom Mailed:

**Mark Rosenbaum**
610 South Ardmore Avenue
Los Angeles CA, 90005

I declare under penalty of perjury under the laws of the United States of America that the forgoing is true and correct.

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on **November 12, 2025** at Los Angeles, California.

KAROLYN LI