# EXHIBIT 2

## Declaration of

## Lauren Fisher Flores

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Jose Antonio PEREZ-FUNEZ; *et al.* <br><br> Plaintiffs, <br><br> vs. <br><br> U.S. Department of Homeland Security, *et al.*, <br><br> Defendants. | Case No.: CV 81-1457-MWF-E <br><br> **DECLARATION OF LAUREN FISHER FLORES** |

I, Lauren Fisher Flores, declare under penalty of perjury that the following is true and correct pursuant to 28 U.S.C. § 1746.

1.  I am the Legal Director of the South Texas Pro Bono Asylum Representation Project (ProBAR), a project of the American Bar Association (ABA). ProBAR was founded in 1989 as a pro bono project to provide access to justice and due process to detained migrants and asylum seekers in the Rio Grande Valley region of South Texas. Today, ProBAR provides pro bono legal services to immigrant adults, children, and families with a specialized focus on detained unaccompanied children in the Rio Grande Valley. ProBAR provides legal services at 20 shelters for unaccompanied children in the Rio Grande Valley and Corpus Christi regions. I submit this declaration to provide with information my organization has gathered in recent months.

2.  I have dedicated my career to working with children at the intersection of immigration law and child welfare. I make this declaration based on personal knowledge and information made known to me in the course of my professional

1

experience, and I make this declaration in my personal capacity and not on behalf of ProBAR or the ABA

3.   Over the years, ProBAR attorneys have represented thousands of members of the class in *Perez-Funez v. District Director, INS*, 619 F. Supp. 656 (C.D. Cal. 1985). ProBAR attorneys represent detained unaccompanied children from countries including Guatemala, Honduras, Nicaragua, El Salvador, and Mexico.

4.   Under normal circumstances and pursuant to the Trafficking Victims Protection Reauthorization Act (TVPRA) and the settlement agreement approved in what is now *Flores v. Bondi*, Case No. CV 85-4544-DMG (AGRx), U.S. District Court for the Central District of California, when a child from a non-contiguous country enters the United States without a parent or legal guardian, Customs and Border Protection (CBP) designates the child an "unaccompanied alien child," issues a Notice to Appear (NTA), and transfers the child to an Office of Refugee Resettlement (ORR) shelter facility within 72 hours. Then ProBAR staff meet with the child within 10 days, provide the child information about their legal rights, review the child's immigration documents, and conduct an intake screening.

5.   In early August of 2025, I started to hear from credible sources about a pilot program to use several of the ORR shelters in the Rio Grande Valley as a staging ground for removals of unaccompanied children from non-contiguous countries, *i.e.*, countries other than Mexico or Canada, who had accepted a form of expedited "voluntary return" while temporarily in CBP custody, before being transferred to ORR custody. Under this pilot program, children from non-contiguous countries may be processed for a removal to their home country within the brief 72-hour period in which CBP has custody of the child. The designated shelters for this program included four where ProBAR serves as Legal Service Provider: Compass Connections Henderson, Compass Connections Cameron, Grace House, and New Hope LSSSS. If children accepted this new form of expedited "voluntary return" and CBP could not repatriate them within 72 hours (the maximum time children

2

may remain in CBP custody), CBP would hold the children in one of the four designated ORR facilities until they could be repatriated.

6. The first week of August, ProBAR identified two children at the above-referenced ORR shelters that purportedly had signed "voluntary return" paperwork with CBP. One child was from Honduras, and he was repatriated within a few days. Another child was from Guatemala. This child was asked his age and then told to sign paperwork for his "voluntary return." The child said the officer told him to sign twice, never explained the form or what he was agreeing to by signing it, never told him what would happen if he did or did not sign, and never told him he could enter legal proceedings seeking to stay in the U.S. The child signed the documents, though he said if he had known he could see a judge, he would not have signed anything. The child expressed fear about returning to Guatemala and, with the assistance of ProBAR counsel, ultimately withdrew his purported agreement to return and filed an asylum application.

7. I have reviewed CBP paperwork for many of the children from non-contiguous countries arriving at the above-referenced ORR shelters in recent months. During that review, I have seen notations in the Form I-213 Record of Deportable/Inadmissible Alien, form a CBP form commonly used when children are apprehended by CBP officials, that refer to the child accepting "voluntary return" and the box on the I-770 form checked to claim that "the subject admitted deportability and requested to return to his/her country voluntarily, without a hearing."

8. Over recent months, newly arrived unaccompanied minors have reported that federal immigration agents pressured them to waive their rights under the TVPRA, to abandon any claims for immigration relief they may have, and instead to accept expedited "voluntary return" from the United States.

9. For example, in early August, ProBAR provided initial services to a child from a noncontiguous country who completed this "voluntary return" interview

3

with CBP. The child reported that he had been handcuffed and interviewed by seven federal immigration officers without a parent or legal counsel present. According to the child, he noticed one of the written answers to a question was not what he had responded, and when asked why it was changed, the officer responded, "I don't care." When the child said he was scared to return home due to violence, the officer replied, "There is also violence and dangers here in the United States." The child described feeling scared and pressured by the officers. The child said that he was told to sign a document for his "voluntary return" without any explanation of what it was, what it meant, or the consequences of signing. Once the paperwork was complete, the child witnessed the officers celebrating. As with other children described here, ProBAR staff only learned of this encounter because CBP was unable to effectuate the child's return within 72 hours, so he was transferred to ORR custody to await his removal.

10. ProBAR staff have since identified a total of 13 children from non-contiguous countries who signed purported "voluntary return" paperwork. Children reported CBP officers behaving aggressively—shouting, insulting, cursing, grabbing, threatening, and handcuffing them. Children reported being scared and confused. Eight of the children are from Guatemala, though others are from Honduras, Ecuador, and Nicaragua.

11. An indigenous Guatemalan boy at the shelter Compass Connections Harlingen said his father is disabled and his parents cannot protect and support him. According to the child, CBP agents shouted, cursed, and threatened the child with a dog and a stun gun. A CBP agent told him he could accept a "voluntary return" or he could remain detained for an extended period of time. The child asked if he could speak with his family before he decided, but the officer refused. The child signed the paperwork. However, an officer then told him he was being sent to a shelter. The child believes his prayers were answered.

12. Another indigenous boy from Guatemala spoke Kiche as his primary language. He was not provided an interpreter. He did not understand the paperwork. According to the child, the officers told him in Spanish that if he did not sign, he would be detained for a long time. He signed the "voluntary return" paperwork. With ProBAR's assistance, he was able to revoke it and is now in court proceedings.

13. A Honduran child at the shelter Upbring New Hope told ProBAR that she had been abandoned by her mother and was unsafe in Honduras. CBP agents detained her after a van crash that left her bleeding from her head and legs. According to the child, the agents denied her appropriate medical care and yelled at her. CBP agents told her she had two choices: go back to her country or go to a detention facility until she was 18 and then be deported to her country anyway. Agents told her to sign a document. She did not understand the paperwork but signed anyway. With ProBAR's assistance, she revoked the purported withdrawal of admission.

14. ProBAR staff are not allowed access to children while they are in CBP custody. Therefore, ProBAR staff only see children with "voluntary return" documentation if CBP has been unable to repatriate them within 72 hours and they have subsequently been transferred to ORR custody. The 13 children whom ProBAR identified as needing immediate representation to halt repatriation were awaiting a "voluntary return" flight while in ORR custody. If children from non-contiguous countries are repatriated directly from the CBP station after signing purported "voluntary return" paperwork, ProBAR staff have no access to them to provide legal services and screenings.

15. On September 30th, I received a call from a representative at the Honduran consulate. The representative told me that consular staff had met with a pregnant Honduran teen in CBP custody because CBP had requested travel documents for the child's repatriation. The representative said that the child did not want to return

to Honduras but that CBP had told her they would arrest her undocumented parents living in the U.S. if she did not sign the "voluntary return" paperwork. The representative asked me for information about the protections available to unaccompanied children, and I explained the TVPRA and its protections for such children, including the right to a hearing with an immigration judge and the right to be released to a sponsor in the community

16.In my professional opinion, having worked with children for 20 years, the conditions of detention in CBP custody create a fearful environment for children. A child cannot make an informed and willing decision about their future while detained in jail-like conditions, feeling the pressure of serious consequences by law enforcement agents. Based upon the information available to me, it is my professional opinion that CBP is using intimidation tactics like prolonged detention in jail-like settings and arrest of family members to coerce children from non-contiguous countries into waiving their rights under the TVPRA and purportedly agreeing to accept "voluntary return" without receiving any process or a hearing before an immigration judge. These practices are, as far as I am aware, new, and appear to be an attempt by CBP to evade the protections children receive under the TVPRA.

17. I declare under penalty of perjury that the foregoing is true and correct.

Executed in __Cameron County__, Texas, on December _22_, 2025.

_____
Lauren Fisher Flores

6