# EXHIBIT 7

Declaration of Emily Norman

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

Jose Antonio PEREZ-FUNEZ; *et al.*

          Plaintiffs,

      vs.

U.S. Department of Homeland Security, *et al.*,

          Defendants.

Case No.: CV 81-1457-ER

**DECLARATION OF EMILY NORMAN, KIDS IN NEED OF DEFENSE**

I, Emily Norman, declare under penalty of perjury that the following is true and correct pursuant to 28 U.S.C. § 1746.

1. My name is Emily Norman and I am an attorney admitted to practice in the state of Connecticut. I am over the age of eighteen and competent to make the statements included in this declaration. The following statements are within my personal knowledge and true and correct to the best of my knowledge.

2. I am employed at Kids in Need of Defense (KIND), a national nonprofit organization providing legal and psychosocial services to unaccompanied children facing removal proceedings in the United States.  Some children who receive legal services through KIND are in the care of the Office of Refugee Resettlement (ORR) of the Department of Health and Human Services (HHS). KIND also serves children who have been released from ORR custody to live with caregivers.

3. Over KIND's history, multiple KIND field offices have served children during their time in ORR custody.  As of the first quarter of 2025, KIND was serving children in approximately 20 short-term shelter care or foster care

1

facilities, five long-term foster care programs, and three Unaccompanied Refugee Minor (URM) programs through KIND's field offices in Atlanta, GA; Boston, MA; Fresno, CA; Hartford, CT; Houston, TX; Los Angeles, CA; New York, NY; Sacramento, CA; and Seattle, WA.  Following interruptions in the first quarter of 2025 in ORR funding for services to unaccompanied children, KIND continues serving released children as well as children in the unaccompanied refugee minors program through its Seattle field office, and children in ORR care through our New York and Hartford field offices.  From the time KIND's Hartford office began serving children in ORR facilities in April 2023 through the end of 2024, the shelters served by the Hartford office received on average approximately 47 children per month.  From 2022 through 2024, the shelter served by the New York office received approximately 260 children per month.  For 2025, those average monthly arrivals fell to approximately 4 and 10 respectively.

4.  I have been employed by KIND in several roles since May 2018, serving both detained and released children.  As of December 2025, I am the Regional Director (East) for KIND's legal programs team and am responsible for oversight and program management of eight field offices, including our New York and Hartford offices, which serve both detained and released children. Before assuming my current role, I served as the Managing Director of KIND's Hartford field office since it opened in April 2023.  KIND's Hartford field office provides legal services to children released from ORR custody, as well as children detained in transitional foster care, shelter care, and long-term foster care.  I joined KIND's New York Field Office in May 2018 and served first as a Pro Bono Coordinating Attorney, then as Senior Attorney and then Supervising Attorney until April 2023. In September of 2019 the New York office began regularly providing legal services to children in ORR care as a designated legal service provider contracted by ORR, and I helped lead that team.

5.  KIND's New York office continues to serve children whom ORR has placed locally in temporary foster care. The program receives children of all ages, ranging from nonverbal babies less than a year old, to children days from their eighteenth birthday. During my time with the New York team, over 6,800 children arrived at the facility, and nearly all received legal services from KIND.

6.  In serving children in ORR care, KIND's Hartford and New York staff meet with virtually all children arriving at their assigned facilities and provide children with Know your Rights (KYR) presentations, legal screenings, assistance or representation in immigration court, and, where appropriate, full legal representation to seek immigration relief.  KIND staff also liaise with shelter and program staff to ascertain the progress of efforts to reunify children with prospective caregivers (referred to as "sponsors") in the United States.

7.  When children in ORR care are scheduled for immigration court hearings, an attorney from KIND generally meets with each child in advance of the hearing and attends immigration court to support the children and to respond to questions from the Immigration Judge.  This may include providing the court with updates about the children's cases, including the status of ORR's efforts to reunify children with sponsors.

8.  When a detained child served by KIND expresses a wish to leave the United States to return to their country of origin, KIND staff meets with the child to understand the child's circumstances, and to counsel the child on the legal consequences of available choices, including voluntary departure. In my experience, some children in detention raise the idea of voluntary departure when feeling particularly hopeless about their prospects of release from custody, but after discussion, indicate that they do not actually wish to return to their previous country. However, if after meeting with an attorney a child makes an informed decision to leave the U.S., a KIND attorney would enter an appearance in the child's removal proceedings and request a hearing on the child's request for

3

voluntary departure. Often, ORR appoints a child advocate from the Young Center for Migrant Children's Rights ("child advocate") for children requesting voluntary departure. This is useful to the process because the lawyer's duty is to advocate for their client's expressed wishes and legal interests, and those interests, in some cases, diverge from the child's best interests under child welfare principles. The appointment of a child advocate helps to ensure that the immigration judge will receive analysis from both perspectives in making a decision on the child's voluntary departure request. In addition to a motion for voluntary departure prepared by the child's attorney, a child advocate may submit a "best interest determination" (BID) based on child welfare law, discussing whether the child's repatriation raises any concerns despite the child's expressed wishes.

9.  In my experience prior to 2025, at a scheduled hearing on a voluntary departure request, the immigration judge's questions to the child typically touched on the availability of a caregiver in the country of origin, whether the child feared return or had been pressured into seeking return, and whether the child understood that the court's order to depart by a date certain would be binding. If satisfied by the child's responses and the child advocate's BID, if applicable, the immigration judge would enter an order permitting voluntary departure. Prior to 2025, none of the staff I supervised ever informed me of being contacted by immigration judges or court staff on the basis that a child had expressed a wish to depart.

10.  I recall only two instances before 2025 in which staff employed at ORR facilities where KIND provided legal services had conversations with children about seeking voluntary departure. In both instances, KIND attorneys learned about the conversations, one of which resulted in a child feeling pressured to the point of requesting voluntary departure from a judge. In that instance, acting in accordance with the child's expressed wishes, a KIND attorney successfully moved the immigration judge to reopen the child's case and rescind the order. In both cases, when I raised the issue of ORR facility staff discussing voluntary

departure with the children, the local Federal Field Specialist employed by ORR to oversee the facility immediately addressed the issue with staff, directing that they should not discuss voluntary departure with children, as it is a legal remedy that children should discuss with attorneys. This directive reflects that children need legal counsel to fully explore all available legal options.  In my experience, it can be confusing to a child if an adult who occupies a position of authority (but is not a lawyer) discusses only one option with the child.

11. In my experience over the past six years, and either directly representing or supervising attorneys representing more than two dozen children in ORR custody requesting voluntary departure, I do not recall a single instance prior to 2025 where the Executive Office for Immigration Review (EOIR) initiated advancing or scheduling a hearing without the child's attorney, KIND, or attorneys from the Department of Homeland Security's Office of the Principal Legal Advisor (OPLA) first requesting it. In contrast, in three cases this year that I am personally familiar with, EOIR advanced or attempted to schedule voluntary departure hearings for children in ORR custody. In all three cases KIND staff had previously met with the children involved, none of whom had asked KIND attorneys to request a hearing on voluntary departure. In these three cases, KIND staff had not entered appearances with the immigration court nor requested a hearing, as is KIND's practice for children requesting voluntary departure. In one case DHS OPLA expressed that they did not request the hearing either. In all three instances KIND staff were informed by EOIR clerks or immigration judges that EOIR had received information that the child wanted to request voluntary departure and that EOIR had scheduled a hearing for that purpose. In one instance KIND staff were informed that the local immigration court received information from EOIR Headquarters regarding the child's interest in voluntary departure.

12. In October 2025 staff at two ORR facilities where KIND is the legal services provider informed KIND that the staff had been instructed to inform

children of an opportunity to receive $2,500 in exchange for returning to their country of origin. On October 15, 2025, a KIND attorney was present at an ORR facility when staff read a statement to that effect to the children at the facility, reading from a script. Staff then asked that the children sign a document confirming they had received the offer. None of the children present at the facility expressed to KIND an interest in taking voluntary departure, either before or after receiving the offer. Other than the two conversations with facility staff described in paragraph 10 above, in my experience working with children in ORR custody over the past six years, I have never observed or heard of a practice of ORR staff offering children a path to voluntary departure if the child had not affirmatively raised it themselves.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Hartford, CT, on the 5th of January, 2026.

_____
Emily Norman