

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOSE ANTONIO PEREZ-FUNEZ,                )       NO. CV 81-1457-ER
                                         )
        Plaintiff/Petitioner,            )
                                         )
    v.                                   )
                                         )
DISTRICT DIRECTOR, IMMIGRATION AND)
NATURALIZATION SERVICE, DAVID            )
CROSLAND,                                )
                                         )
        Defendants/Respondents.          )
_____)       CONSOLIDATED WITH
                                         )
YANIRA PENA, CLAUDIA PENA,               )       NO. CV 81-1932-CBM
                                         )
        Plaintiffs,                      )
                                         )
    v.                                   )
                                         )
IMMIGRATION AND NATURALIZATION           )
SERVICE, MICHAEL LANDON, ALAN            )       **M E M O R A N D U M**
NELSON,                                  )
                                         )       **O P I N I O N**
        Defendants.                      )
_____)

### I.    INTRODUCTION

These consolidated cases come before the Court on plaintiffs' class action challenge, primarily on due process grounds, to the way in which the Immigration and Naturalization Service (INS) implements its voluntary departure procedure

-1-

concerning unaccompanied minor aliens. The principal allegation is that INS policy and practice coerces class members into unknowingly and involuntarily selecting voluntary departure, thereby waiving their rights to a deportation hearing or any other form of relief.

The nationwide class seeks the following relief: (1) a judgment declaring the INS' practices violative of the due process clause of the Fifth Amendment to the Constitution; and (2) a permanent injunction prohibiting the INS from effectuating voluntary departure of class members without first providing certain procedural safeguards to ensure a valid waiver of rights.

## II.    THE PARTIES AND JURISDICTION

The class is defined as:

> All persons who appear, are known, or claim to be under the age of eighteen years who are now or in the future taken into or held in custody in the United States by agents of the Immigration and Naturalization Service for possible deportation from the United States, and who are not accompanied by at least one of their natural or lawful parents at the time of being taken or received in custody within the United States.

The class representatives are natives and citizens of El Salvador who, at the time of their arrest by the INS, were minors unaccompanied by either a parent or legal guardian.

Defendant INS is a federal agency with nationwide jurisdiction to implement the Immigration and Nationality Act (8 U.S.C. §§ 1101-1503). The individual defendants are INS officials, including the District Director of the Los Angeles District Office of the INS.

Jurisdiction is proper under 28 U.S.C §§ 1331,

-2-

1343(4), 1361, and 8 U.S.C. § 1329. Class treatment is appropriate under F.R.CIV.P. 23. See Perez-Funez v. District Director, INS, 611 F. Supp. 990 (C.D. Cal. 1984).

### III.    BACKGROUND

#### A.    Factual

Plaintiff and class representative Perez-Funez was sixteen years old when the INS arrested him near the Mexican border in California on March 22, 1981. He claimed that the INS presented him with a voluntary departure consent form without advising him of his rights in a meaningful manner.

Although he claims that he did not want to return to El Salvador, he signed the form because: (1) an INS agent told him he might otherwise have a lengthy detention period and (2) an agent informed him that he could not afford bail.[1] He testified that he did not read or understand the voluntary departure form. He was at Los Angeles International Airport, bound for El Salvador, when an attorney intervened to keep him in this country.

The other class representatives have similar stories. Jose and Suyapa Cruz,[2] ages twelve and thirteen, respectively, at the time of their apprehension in Yuma, Arizona, claim the INS presented the voluntary departure forms without any explanation of rights and told them to sign. These children also signed but only because they did not understand they were waiving their rights to other possible relief.

Yanira and Claudia Pena[3] were thirteen and eleven years old, respectively, when the INS took them into custody

in San Ysidro, California. They too claim the INS gave them voluntary departure forms and told them to sign with no further explanation. They signed believing they had no other alternative.

Fourteen other class members testified at trial. Although their stories varied in some respects, all stated they signed the form unknowingly and involuntarily.

### B. Procedural

Counsel originally filed the Perez-Funez case as a petition for habeas corpus, subsequently amending it into a class action seeking declaratory and injunctive relief. The Cruz children intervened as plaintiffs in October 1981.

The Penas filed a separate class action asking for identical relief. In January 1984 the Court consolidated the cases, certified a nationwide class, and granted certain preliminary injunctive relief. See Perez-Funez, 611 F. Supp 990. The court tried the case in April 1985, ordered post-trial briefs, and heard closing arguments in August 1985.

### IV. VOLUNTARY DEPARTURE—THE CHALLENGED PROCEDURE

Voluntary departure is a procedure by which a qualifying alien may consent to summary removal from the United States, normally at the alien's expense. For the INS to implement this procedure, the alien must sign the voluntary departure form (form I-274), waiving the right to a deportation hearing and all alternative forms of relief.

INS policy concerning voluntary departure of unaccompanied minors varies according to the age, residence, and place of apprehension of the child. [4] For class members

-4-

age fourteen to sixteen, the INS first gathers extensive information regarding the child, using form I-213. Plaintiffs' Exhibit 5.  The INS then notifies the minor of the opportunity for voluntary departure by means of the voluntary departure form.  Plaintiffs' Exhibit 3.  At the bottom of this form, the child can sign and request either a deportation hearing or voluntary departure.  Since January of 1984, INS agents have been giving the so-called "Perez-Funez Advisals" prior to presentation of the form.  Plaintiffs' Exhibit 13. The Court ordered the giving of this notice as part of the preliminary injunction.  See Perez-Funez v. District Director, INS, 611 F. Supp. 990 (C.D. Cal. 1984).

The INS, however, has a different policy for class members age fourteen through seventeen  who are arrested near the Mexican or Canadian borders and whose permanent residence is in one of those two countries.  In such cases, the INS temporarily detains the child until a foreign consulate official arrives.  If the minor has requested voluntary departure and the official confirms that the child can be returned, transportation arrangements are made.  If such an official is not readily available, the INS will take the child to a Mexican or Canadian immigration officer. [5]

For class members under fourteen, the INS follows the same procedure as for fourteen to sixteen year-olds with certain significant additions.  First, the INS looks for an adult relative accompanying the child to act as a consultant. If none is found, the agency contacts the appropriate foreign consulate in an effort to locate friends or relatives.  If

necessary, the INS will then contact the American Embassy in an effort to arrange a reunion with relatives or friends. When the INS cannot locate a friend or relative, it will allow the foreign consul to represent the child. Once a representative for the minor is found, the INS notifies him or her of the right to a deportation hearing and the opportunity for voluntary departure. [6] An exception to this adult consultation requirement exists for minors apprehended near the border and whose permanent residence is in Mexico or Canada. [7]

Thus, the policy varies depending on the situation. Moreover, the INS retains the discretion to refuse voluntary departure whenever it believes this type of disposition is inappropriate. It exercises this discretion more frequently with class members under fourteen.

Although voluntary departure represents a waiver of rights, it is in many ways a privilege. See Tzantarmas v. United States, 402 F.2d 163, 165 n.1 (9th Cir. 1968). Its advantages to the alien are that it has no adverse impact upon future lawful attempts to enter the United States (as contrasted with a formal deportation order), and it normally reduces the alien's time in detention. The advantage to the INS is that voluntary departure allows for summary disposition of the case, averting the need for a deportation hearing.

Plaintiffs do not challenge the existence or fairness of voluntary departure per se. Rather, they assert that class members are coerced into choosing this option and waiving their rights, regardless of whether voluntary

-6-

departure would be in the child's best interests.

## V.    LEGAL DISCUSSION

### A.    Introduction/Analytical Framework

The thrust of plaintiff's claim is that the INS' policy concerning voluntary departure deprives unaccompanied minor aliens of significant rights, thereby violating the due process guarantees of the Fifth Amendment to the United States Constitution.

Due process is a flexible concept, its requirements varying according to the time, place, and circumstances. Cafeteria Workers v. McElroy, 367 U.S. 886, 895 (1961). In Mathews v. Eldridge, 424 U.S. 319 (1976), the Supreme Court set forth a three-part balancing test for the resolution of procedural due process issues. First, the court must consider the private interest affected. Second, the court has to evaluate the risk of erroneous deprivations of rights under the challenged procedures and the probable value, if any, of additional or substitute procedural safeguards. Last, the court must balance the government's interest, which includes consideration of the function involved as well as the burdens that supplemental or substitute procedures would impose. Id. at 335. This test provides a framework for the Court's analysis of plaintiffs' challenge.

### B.    Rights and Interests of Class Members

Unaccompanied alien children possess substantial constitutional and statutory rights. These rights exist in spite of the minors' illegal entry into the country. See Mathews v. Diaz, 426 U.S. 67, 77 (1976). Further, the Court

-7-

notes that "[c]hildren have a very special place in life which law should reflect." May v. Anderson, 345 U.S. 528, 536 (1953) (Frankfurter, J., concurring). See also In re Gault, 387 U.S. 1, 13 (1967) ("neither the Fourteenth Amendment nor the Bill of Rights is for adults alone").

Plaintiffs, however, do not possess rights equivalent to those of criminal defendants. Deportation proceedings are civil in nature. INS v. Lopez-Mendoza, ___ U.S. ___, 104 S.Ct. 3479, 3484 (1984). Thus, the exclusionary rule does not apply. Id. Moreover, Miranda warnings generally are inappropriate in the deportation context. Trias-Hernandez v. INS, 528 F.2d 366, 368 (9th Cir. 1975). Finally, there is no due process or statutory right to appointed counsel. Martin-Mendoza v. INS, 499 F.2d 918 922(9th Cir. 1974).

Nonetheless, plaintiff's rights are significant. Foremost among these is the right of every alien to a deportation hearing, which right is waived when a child signs the voluntary departure form. Obviously, this proceeding is critical in terms of the interests at stake. According to the Supreme Court in Wong Yang Sung v. McGrath, 339 U.S. 33, 50 (1950), "A deportation hearing involves issues basic to human liberty and happiness and, in the present upheavals in lands to which aliens may be returned, perhaps to life itself." These words are no less applicable today.

Also reflective of the substantial nature of this right is the statutory provision for an evidentiary hearing in which the alien has a right to notice, to counsel (at no

expense to the government), to present evidence and cross-examine witnesses, and to a decision based upon substantial evidence. 8 U.S.C. § 1252(b). Due process requires no less. United States v. Gasca-Kraft, 522 F.2d 149, 152 (9th Cir. 1975).

In addition, when an unaccompanied minor waives the right to a deportation hearing, he or she effectively waives the right to various forms of relief from deportation: (1) adjustment of status (8 U.S.C. § 1245); (2) suspension of deportation (8 U.S.C. § 1254); (3) political asylum (8 U.S.C. § 1158) or withholding of deportation (8 U.S.C. § 1253(h)(1)); [8] and (4) deferred action status (Operating Instruction 103.1). Although many class members are not eligible for such relief, the eligible child who instead signs for voluntary departure makes a grave mistake indeed.

Therefore, taken together, the right to a deportation hearing and the various rights associated therewith [9] constitute a substantial liberty interest on the part of plaintiff class members. Given the interests at stake and the tender ages of the possessors of those interests, the Court must carefully scrutinize the risk of erroneous deprivation.

**C.  Risk of Erroneous Deprivation and Probable Value of Additional Procedural Safeguards**

**1.  Risk of Erroneous Deprivation**

A class member's signature on the voluntary departure form waives the various rights discussed in the preceding section. Accordingly, the risk of erroneous deprivation issue boils down to whether the INS' procedures

concerning voluntary departure result in effective waivers.

A waiver is "an intentional relinquishment or abandonment of a known right or privilege." Johnson v. Zerbst, 304 U.S. 458, 464 (1938). A presumption against such an abandonment of rights exists in the civil as well as the criminal context. See Fuentes v. Shevin, 407 U.S. 67, 94 n. 31 (1972).

In order for a criminal defendant to waive the right to counsel, the waiver must be voluntary as well as knowing and intelligent, an issue which depends in each case "upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." Johnson, 304 U.S. at 464. Although the instant proceedings are civil, it is nevertheless clear that "[w]hatever the right, the standard for waiver is whether the actor fully understands the right in question and voluntarily intends to relinquish it." Edwards v. Arizona, 451 U.S. 477, 489 (1981) (Powell, J., with whom Rehnquist, J., joins, concurring in the result).

In addressing the question of whether plaintiffs proved that the waivers obtained by the INS are invalid, the Court first is compelled to comment upon what plaintiffs did not prove. One of plaintiffs' principal allegations through-out this litigation has been that the INS engages in a policy of overt coercion of unaccompanied minors that allegedly includes physical mistreatment and verbal abuse. However, this Court has found that allegation to be unfounded. While some of the class members testified to receiving such

mistreatment, the Court simply does not believe those witnesses on this point. Moreover, the Court found the INS' rebuttal testimony on this issue to be credible. Finally, even if some isolated incidents of mistreatment occurred, these are insufficient to justify the nationwide injunctive relief plaintiffs seek. See Allee v. Medano, 416 U.S 802, 815 (1974). Thus, in many ways, the trial vindicated the good faith efforts of the INS. [10] This agency performs a thankless task under adverse conditions and, by and large, performs it admirably.

Nevertheless, even if the trial proved nothing else, it demonstrated that, under the procedures currently employed, unaccompanied minors do not understand their rights when confronted with the voluntary departure form. This is the one inescapable conclusion to be drawn from this lawsuit.

The Court heard the testimony of a parade of class members, predominately Salvadoran, and the Court found them to be credible concerning their lack of understanding. Their absence of knowledge was clear, even in situations where they had read, or had read to them, the forms and advisals. In fact, at the time of trial, plaintiffs still did not understand their legal rights. Even defendants' own witnesses conceded that the children did not grasp the "legal language" in the forms and that they did not "know what to do."

Plaintiffs' expert witnesses buttressed this conclusion. The upshot of their testimony was that minors generally do not understand the concept of legal rights without explanation. Further, according to the experts, when

children's rights are presented to them in a stressful situation in which they are separated from their close-knit families and faced with a new culture, they cannot make a knowing and voluntary choice. Rather, the natural tendency is to defer to the authority before them, especially for those children accustomed to autocratic governments.

The Court notes that, as discussed above, INS policy treats children fourteen years of age and older differently from younger class members. When older children are involved, the INS makes less of an effort to contact a parent or relative, and it usually will honor the child's voluntary departure selection. The agency bases this different treatment on an assumption that older children are better able to make important decisions. For this proposition, they rely primarily on certain sections of the Immigration and Nationality Act, which oblige children fourteen and older to register and be fingerprinted (8 U.S.C. § 1302(a)(b)) and to give notice of any change of address (8 U.S.C. § 1305). Section 1306 provides penalties for failure to comply with these requirements as well as for other offenses.

Although the Court does not lightly disregard agency policy preferences, it cannot agree with the INS' age distinctions. First, the statutes upon which the INS relies do not address the constitutional issue present in this case. Class members face a much more difficult task in comparison to the obligations imposed by the statutes.

Second, the Court heard testimony from class members of various ages, some under fourteen and some over, and the

-12-

absence of understanding was consistent. Age apparently made little difference. Last, expert testimony indicated that, while the minors' ability to understand the semantic meaning of words increases with age, older children encountering the instant situation still would be incapable of making informed decisions concerning the exercise or waiver of individual rights.

All of the foregoing is consistent with common sense. As the Supreme Court noted in Bellotti v. Baird, 443 U.S. 622, 635 (1979), "during the formative years of childhood, minors often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them." See also Eddings v. Oklahoma, 455 U.S. 104, 116 ("Even the normal 16 year-old customarily lacks the maturity of an adult"). In the instant case, unaccompanied children of tender years encounter a stressful situation in which they are forced to make critical decisions. Their interrogators are foreign and authoritarian. The environment is new and the culture completely different. The law is complex. [11] The children generally are questioned separately. In short, it is obvious to the Court that the situation faced by unaccompanied minor aliens is inherently coercive. [12] Moreover, the INS' policy of allowing border patrol agents to explain rights but prohibiting the giving of advice does nothing to alleviate the problem.

The major divergence from this pattern of unknowing waiver was the evidence presented concerning class members apprehended in the immediate vicinity of the border and whose permanent residence is in Mexico or Canada. Plaintiffs

-13-

presented only one Mexican minor as a witness, and while he appeared to sign the voluntary departure form in ignorance, the INS offered substantial evidence that the risk of unknowing waiver is less for this portion of the class. First, simply because of the proximity of Mexico and Canada to the United States, these individuals are more informed concerning immigration matters.  In fact, border patrol agents testified that some Mexican minors become impatient when agents read advisals to them because the minors are extremely familiar with such material.  Second, the evidence indicated that many Mexican class members want to take voluntary departure following a short adventure into this country, and agents stationed near the border testified that it was not unusual to apprehend and process certain Mexican minors on a recurring basis.  Thus, while these minors most certainly have the same rights as other class members and even though the possibility of coerced waiver still exists, the risk of deprivation appears to be significantly decreased.  Indeed, at closing argument, plaintiffs' counsel conceded that procedures for these class members need not be as elaborate.

The other decreased risk scenario involves class members under fourteen who either are arrested outside the immediate vicinity of the border or are not permanent residents of Mexico or Canada.  With these children, the INS policy is to make a strong effort to locate relatives or friends of the child to act as a representative.  If the agency can locate no relative or friend, it will allow a consulate official from the minor's home country to act as the

-14-

child's advisor. [13] The INS also uses its discretion to refuse voluntary departure more often in such cases.

This policy removes, for the most part, the risk of unknowing and involuntary waiver by putting the child in communication with a relative or friend. The major flaw, however, arises when the INS cannot find a relative or friend and thus turns to a consulate official. While the Court cannot find fault with a practice of notifying foreign officials of their citizens' illegal presence in this country, the Court believes that allowing foreign consuls to represent the child in the deportation process creates a substantial risk of error. [14] Class members from such countries as El Salvador and Guatamala often are fleeing political and military conditions in their homelands. Therefore, the foreign consul may well have a position adverse to that of the class member. Accordingly, the Court cannot assume that the foreign official would have the child's best interests at heart. Other than this problem, the Court believes this particular policy adequately ensures a valid waiver.

The INS asserts that even if some class members sign the form in ignorance, the agency's procedures provide sufficient "safety valves" to prohibit erroneous voluntary departures. Principal among these is the INS discretion to refuse to implement this type of disposition. [15] In essence, the INS, by procuring the waiver at an early stage of the process, puts itself in control of the child's destiny. While the Court approves of the INS' power to fulfill a supervisory role, "the admonition to function in a 'parental' relationship

is not an invitation to procedural arbitrariness." Kent v. Untied States, 383 U.S 541, 555 (1966).  When the waiver is invol-

untary and without understanding, a forfeiture of rights occurs, irrespective of the INS' good intentions.  Due process protects children from placing themselves at the mercy of summary procedures.  Cf. In re Gault, 387 U.S. 1 (1967).

In sum then, the risk of erroneous deprivation is great, especially with respect to class members who are not arrested near the border or are not permanent residents of Mexico or Canada.  The processing environment is inherently coercive and current procedures do not address the problem adequately.

### B.    Probable Value of Additional or Substitute Safeguards

Mathews v. Eldridge next requires the Court to consider the probable value of additional or substitute safeguards in minimizing the aforementioned risk of deprivation.  424 U.S. at 335.  Along these lines, the Court notes that plaintiffs' demands have decreased measurably from the early stages of this litigation.  At one time plaintiffs sought an injunction requiring an arraignment-type hearing and appointment of counsel.  Before the waiver could become effective, plaintiffs demanded a requirement of representation by counsel or a determination by an immigration judge that the waiver was knowing, intelligent, and voluntary.  See Perez-Funez v. District Director, INS, 611 F. Supp. 990, 1001 n.25 (C.D. Cal. 1984).

-16-

By the time the parties submitted this case for decision, the proposed safeguards had shrunk to the following: (1) simplified rights advisals; (2) a videotape advisal by a neutral third party; and (3) access to telephones so that the children can contact an attorney, parent, or close relative. Along with access to telephones, plaintiffs seek to require the INS to use an updated list of free legal services, which list plaintiffs prepared.

Addressing the proposed safeguards in order, the Court believes that a simplified advisal would be of some value.  It was evident from the trial that class members understood neither the INS' notification of rights (form I-274) nor the Court's own so-called "Perez-Funez Advisals." Moreover, plaintiffs proposed simplified advisal (Plaintiffs' Exhibit 52) fared little better.  The evidence was contradictory concerning its effectiveness, and in content, it is both incomplete and partially incorrect.  Nonetheless, both sides seem to agree that a written advisal is appropriate, and thus the goal should be to devise the simplest and most accurate advisal possible.

However, the principal lesson learned from the testimony concerning the written advisals was that such advisals alone are insufficient to apprise class members of their rights.  This was the case even when border patrol agents read and attempted to explain the advisals to the children.  With that in mind, the Court now evaluates the videotape advisal.

The Court itself actually suggested the idea of a

video presentation in a question to one of the expert witnesses. Plaintiffs quickly adopted it as a proposed solution. While the Court still believes the videotape advisal would be of some utility, further consideration has left the Court with doubts. True, such an advisal would offer the advantage of bringing a neutral third party into the process. The basic problem with the videotape, however, is that it cannot answer questions or give individualized advice. Given the testimony of class members and the overall coerciveness of the situation, the videotape presentation probably would provoke more questions than it would answer. The children thus would be back in a position of asking questions to INS agents, who are the children's arresting officers [16] and who are instructed not to give advice. Moreover, this proposed remedy would involve a substantial expenditure by the government, which is more appropriately discussed in the next section. Therefore, the Court finds the videotape advisal to be of only limited value.

That brings the Court to plaintiffs' final proposal: early access to telephones and an updated list of legal services. In light of all the evidence presented, the Court has found that access to telephones prior to presentation of the voluntary departure form is the only way to ensure a knowing waiver of rights.

As developed more fully above, the limited understanding and decision-making ability of the class members, the critical importance of the decisions, and the inherently coercive nature of INS processing require that the

-18-

children be given some assistance in understanding their rights.  The written advisals alone are insufficient. Further, despite the good faith efforts of most INS agents to be of help, the fact remains that the agents are also the arresting or detaining officers and thus are in an adversary position vis-a-vis the children.  Cf. In re Gault, 387 U.S. at 35-36 (probation officer is also arresting officer and therefore cannot advise minor adequately).  Accordingly, contact with a third party is necessary.

Communication with counsel would be preferable.  As stated in In re Gault, 387 U.S. at 36:

> The juvenile needs the assistance of counsel to cope with problems of law, to make skilled inquiry into the facts, to insist upon regularity of proceedings, and to ascertain whether he has a defense and to prepare and submit it.

Under the circumstances presented in this case, legal counsel certainly would be the best insurance against a deprivation of rights. [17]

The Court, however, is by no means ruling that unaccompanied minors have a right to appointed counsel.  The case law clearly forecloses such a finding.  See, e.g., Martin-Mendoza v. INS, 499 F.2d 918, 922 (9th Cir. 1974).

Rather, access to legal advice is merely one way of removing class members from an overly coercive environment. The other alternative is to have children contact a parent, close adult relative, or adult friend [18] who can put the child on a more equal footing with the INS.  See Eddings v. Oklahoma, 455 U.S. 104, 115 (1982) ("A lawyer or an adult relative or friend could have given the petitioner the

-19-

protection which his own immaturity could not."). Indeed, in his excellent closing argument, plaintiffs' counsel observed that a minor who had contacted a parent or close relative is no longer "unaccompanied." Thus, the Court simply is proposing to remove the child from the status of being unaccompanied, or alternatively, give the child access to the type of person most likely to advise the child adequately of his or her rights. [19]

Making the policy concerning telephone calls uniform also would be of great value. The class members' testimony indicated that the INS either denied access to phones or allowed access only after execution of the voluntary departure form. As for the INS' evidence, Deputy Chief Bowen stated that the policy was to first fill out the general information form (the I-213) and then allow phone calls consistent with office conditions. The practical outgrowth of this policy, based on the testimony of the various border patrol agents, was that the agents permitted a phone call prior to presentation of the voluntary departure form only in the low-volume offices and then only upon request. Certainly the evidence did not indicate a standard practice of allowing a phone call prior to the waiver of rights or of affirmatively notifying the children of the opportunity to make a call.

The Court believes that, with respect to class members not apprehended in the immediate area of the border or whose permanent residence is not Mexico or Canada, mandatory contact with either counsel, a close relative, or friend prior to presentation of the voluntary departure form is

central to the success of the telephone proposal.  The evidence makes it clear that, in the absence of such communication, the great majority of these class members will commit an unknowing and involuntary waiver.

Moreover, the contact must be made before presentation of the form.  Otherwise, the child comes under the added burden of having to take affirmative steps to withdraw the prior waiver.  In an environment such as the one facing the unaccompanied minor, this task would be difficult, assuming *arguendo* the child would be able to grasp the withdrawal of consent concept at all.

Regarding class members arrested near the border who are residents of the contiguous countries, the probable value of a mandatory call is less.  As discussed above, the evidence indicated these class members generally have a better understanding of the immigration laws and, for the most part, desire to voluntarily return.  While once again stressing that these children have rights equivalent to those of other class members, the evidence presented has convinced the Court that mandatory notification of the opportunity to call an attorney, close relative, or friend  would be sufficient in the great majority of cases. [20]  Mandatory notification is still necessary to prevent unknowing waivers by those children who do need help but are too intimidated and confused to request a call.

Updated and accurate lists of free legal services are a necessary concomitant of a telephone access program. The trial demonstrated two things concerning the lists.

First, there are numerous legal service groups willing to provide free services to indigent class members. Second, the lists which the INS currently uses are outdated and inaccurate. Accordingly, it is not difficult for the Court to find that updated lists would be valuable in promoting informed waivers.

In sum then, the Court has found that there is some probable value in providing class members with a simplified rights advisal and at least a minimal amount of utility in developing a videotape presentation. However, access to telephones would provide by far the greatest benefits in the hopes of ensuring knowing and voluntary decision-making.

### IV.    Governmental Interests and Burdens/The

### Propriety of Injunctive Relief

Finally, Mathews v. Eldridge instructs the Court to balance the previously-discussed individual rights and proposed safeguards with the government's interests, including the function involved and the burden that additional procedures would impose. 424 U.S. at 335. Relatedly, when the Court considers the governmental interest, it must consider the propriety of injunctive relief, keeping in mind that an injunction "should be no more burdensome to the defendant than necessary to provide complete relief to plaintiffs." Califano v. Yamasaki, 442 U.S. 682, 702 (1979). Moreover, the Court wishes to defer to the INS' expertise when constitutionally permissible. Thus, any remedy should be "tailored to correct the specific violation and no more obtrusive than to satisfy the constitutional minima."

Hoptowit v. Ray, 682 F.2d 1237, 1258 (9th Cir. 1982). In addition, the Court is ever mindful that the INS is an agency of limited resources.

As an initial point, consistent with its national function and purpose, the INS has an interest in ensuring that class members make knowing and voluntary decisions. Thus, to the extent that additional safeguards preserve constitutional rights without unduly burdening the agency, such safeguards are consistent with the INS' interests and function.

Dealing with the proposed remedies individually, the Court first addresses the issue of simplified advisals. This issue presents little difficulty because the INS has stated that it does not object to a simplified advisal which is legally accurate.[21] Indeed, a more effective advisal would be a benefit rather than a burden to the INS since it would reduce confusion and expedite the process. Therefore, the Court will adopt the suggestion of plaintiffs' counsel and direct the parties to confer with each other and with experts to draft a simplified advisal, which should be submitted to the Court for approval.

The next proposed safeguard is the videotape advisal. As discussed in the preceding section, this remedy would be of only limited usefulness. In fact, if the telephone procedures are implemented properly, the videotape would have virtually no utility.

Moreover, use of a videotape presentation would be administratively burdensome. Numerous question would arise over the most appropriate spokespersons, the content, and the

number of languages to be covered.  Further, creation of the advisal would be expensive as would be procurement of all the equipment required to present it.  On balance, the burden to the government outweighs the value of the proposed safeguard, mandating that this remedy be rejected.

The final proposed safeguard is access to legal counsel along with an updated list of legal services.  In evaluating the burden such relief would impose on the INS, the Court has considered that the INS is an agency of limited resources.  Moreover, the Court is well aware that conditions differ at each INS post with respect to volume of class members processed, nationalities encountered, nature of the apprehensions made, and facilities available. Accordingly, the Court must tailor any relief and at the same time allow the INS as much flexibility as possible.  Califano v. Yamasaki, 442 U.S. 682, 702 (1979); Hoptowit v. Spellman, 753 F.2d 779, 785 (9th Cir. 1985).

Having considered all of the foregoing factors, the Court believes that, in the case of class members who are not apprehended in the vicinity of the border or are not permanent residents of Mexico or Canada, requiring phone contact with a legal counselor, close relative, or friend prior to presenta- tion of the voluntary departure form is not unduly burdensome. According to immigration attorney Della Bohen, it takes approximately ten minutes to discuss legal options with class members.  This short length of time should not disrupt processing significantly, even at the high volume posts. [22]

Additionally, the INS expressed concern that a

requirement of immediate contact with counsel or a relative would prevent the agency from promptly obtaining the background information necessary for efficient processing (this involves filling out the I-213 form). Recognizing this concern, the Court sees no problem with allowing the INS to procure information for the I-213 before giving access to telephones. The only constitutional necessity is that the child make contact before presentation of the voluntary departure form since no waiver occurs until the child signs. Therefore, as long as the INS does not attempt to obtain a waiver at this high-risk stage, it is perfectly free to perform its information-gathering function.

Another INS concern is that allowing phone calls in certain areas will promote smuggling by class members. [23] While the agency presented some evidence of such a problem, the evidence did not convince the Court that the practice is pervasive. However, in those situations in which the INS believes that systematic smuggling is occurring, the Court is not adverse to permitting the agency to place or monitor calls or adopt any alternative solution to protect against this perceived problem. Of course, any alternative procedure must provide for communication prior to presentation of the voluntary departure form.

The Court further notes that this requirement does little to increase the burden which the INS currently undertakes concerning class members under age fourteen. Under that policy, contact with some third person already is required. Thus, with respect to these class members, the

-25-

Court is merely substituting contact with legal counsel in place of representation by a foreign consulate that might not have interests consistent with those of the child.

As for those class members apprehended in the immediate vicinity of the border and who are permanent residents of Mexico or Canada, the burden would be even less than it is for other class members since the INS would only have to offer a phone call. Given the evidence that these class members generally have a better understanding of their rights and genuinely desire to voluntarily return, most will no doubt forego the call. Thus, the Court's relief would impose virtually no additional burden. Since this group constitutes the great majority of the class, this less elaborate procedure should reduce greatly the overall burden of the Court's relief.

Updating and maintaining the legal service lists would burden the INS to a certain extent although plaintiffs presented evidence indicating that the effort required is rather slight. Further, pursuant to 8 C.F.R. § 292a.1, the INS district director has a duty to maintain the lists. Because accurate lists are indispensable to the smooth operation of the telephone remedy and since free legal services are indeed available, the need for updating and maintaining the lists far outweighs the slight burden.

However, the Court will not require the INS to accept plaintiffs' proposed list in toto. Regulations provide procedures for adding organizations to the lists, and there is no reason to ignore these procedures. Moreover, the

organizations must be qualified. Plaintiffs' work will be of help to the agency, but the Court will leave the ultimate composition of the list to the INS and its governing regulations. The Court's sole requirement is that the INS maintain the lists in such a way that they will serve their purpose. The current lists do not.

The Court realizes that the additional safeguards will entail some expense. However, it is well established that "the cost of protecting a constitutional right cannot justify its total denial." Bounds v. Smith, 430 U.S. 817, 825 (1977). Further, the Court moves cautiously when considering the imposition of injunctive relief upon an agency with far greater expertise than the Court in immigration matters. Yet, the constitutional analysis is clear: unaccompanied alien minors possess significant constitutional and statutory rights, the risk of deprivation of those rights is great, and the rights can be protected by placing a comparatively minimal burden upon the government. Under the circumstances, the Court has to act.

The INS contends that injunctive relief is not appropriate. Were the Court's finding of constitutional violations based upon plaintiffs' allegations of coercive mistreatment, the INS' contention would be correct since plaintiffs only showed "isolated incidents" of misconduct. See Allee v. Medrano, 416 U.S. 802, 815 (1974). However, the Court instead has found that it is the policies and procedures themselves that are constitutionally infirm. Thus, even assuming the INS follows its procedures, due process defects

still exist.

The INS also argues that, even if plaintiffs are entitled to an injunction, they have not proven entitlement to nationwide injunctive relief. The INS primarily bases this contention on the fact that almost all of plaintiffs' witnesses were Salvadorans apprehended in the Southern California region.

As stated above, when injunctive relief is under consideration, "the nature of the violation determines the scope of the remedy . . ." Swan v. Charlotte-Mecklenberg Board of Education, 402 U.S. 1, 16 (1971). In its prior opinion, this Court observed that if the INS were found to be violating plaintiffs' rights, it would be doing so on a nationwide basis. Perez-Funez, 611 F. Supp. at 1000. Not only have plaintiffs shown application of the policy in three different states, the Bertness memorandum establishes a uniform national policy to be implemented by an agency with nationwide jurisdiction. Id. at 1000-1001. Therefore, the prior rationale is still applicable.

In addition, plaintiffs' expert witness testimony did not limit itself to children of certain nationalities apprehended in limited areas. The problems of an inherently coercive situation and impaired decision-making ability are universally present. The testimony of the class members was consistent with the expert opinions. Therefore, nationwide relief is appropriate.

Further, plaintiffs' injuries are real. [24] Granted, only a fraction of the testifying class members

actually were deported.  However, several others teetered on the brink of deportation, with only fortuitous delays in travel arrangements keeping them in the country.  Moreover, the Court cannot ignore the inherent difficulty of locating victims of erroneous voluntary departure.  Simply put, the best plaintiffs' witnesses are children no longer in this country.  Finally, of the witnesses who were not deported, several spent substantial periods of time in detention centers, which incarceration can be attributed in part to their lack of understanding.  Therefore, plaintiffs have suffered injuries sufficiently real to entitle them to injunctive relief.  See 11 C. Wright & A. Miller, Federal Practice and Procedure § 2942 at 368.

## CONCLUSION

This case has presented a real dilemma to the Court since it is not easily moved to intervene in the operations of a well-intentioned agency with considerable expertise. Nonetheless, plaintiffs have shown a deprivation of rights and so reduced their demands that their proposed relief is, for the most part, not unduly burdensome.  Balancing the private interests affected with the risk of deprivation, the probable value of additional safeguards and the government's interest, the Court has determined that past and current INS procedures violate the due process rights of plaintiff class.

Accordingly, the Court will enter a judgment declaring the original INS procedures to be unconstitutional and enjoining any return to those procedures.  Further, the Court will make the preliminary injunction of January 24, 1984

-29-

permanent with the following modifications:

1.    The language "employ threats, misrepresentations, subterfuge, or other forms of coercion or . . ." shall be stricken as no longer necessary.

2.    The parties are to confer among themselves and with experts to prepare a simplified rights advisal consistent with the current law of this circuit.  This advisal should be prepared within thirty days of the entry of this judgment and submitted to the Court for approval.  Once approved, it shall be read and provided to class members in the same manner as the previous advisal, along with the free legal services list compiled pursuant to 8 C.F.R. § 292a.1.

3.    With respect to class members apprehended in the immediate vicinity of the border and who reside permanently in Mexico or Canada, the INS shall inform the class member that he or she may make a telephone call to a parent, close relative, or friend, or to an organization found on the free legal services list.  The INS shall so inform the class member of this opportunity prior to presentation of the voluntary departure form.

4.    With respect to all other class members, the INS shall provide access to telephones and ensure that the class member has in fact communicated, by telephone or otherwise, with a parent, close adult relative, friend, or with an organization found on the free legal services list. The INS shall provide such access and ensure communication prior to presentation of the voluntary departure form.

5.    The INS shall obtain a signed acknowledgment

-30-

from the class member on a separate copy of the simplified rights advisal showing that the INS has provided all notices and required information, including confirmation of communication with a parent, close adult relative, friend, or legal organization, when applicable.

6.    The district director shall update and maintain the free legal services list compiled pursuant to 8 C.F.R.°° § 292a.1.

Any motion for attorneys' fees should be filed in accordance with the Local Rules.

**IT IS SO ORDERED.**

The Court further orders the Clerk to serve copies of this Memorandum Opinion on all parties by United States Mail.

DATED:    September 30 , 1985.

_____
EDWARD RAFEEDIE
United States District Judge

-31-

## F O O T N O T E S

1.   Perez-Funez apparently signed consent forms twice.  He signed once out of fear of detention, but after a short conference with an attorney, he withdrew that consent. After the attorney left, Pererz-Funez testified that an INS agent told him bail would be unaffordable and that he should take voluntary departure.  He did.

2.   The Cruz children testified before Magistrate Geffen on November 19, 1981 as part of the hearing on the motion for a preliminary injunction.  The Court deems this testimony to be part of the record pursuant to F.R.CIV.P. 65(a)(2).

3.   Only Yanira Pena testified at trial.

4.   See generally Bertness Memorandum, Plaintiffs' Exhibits 16-17.

5.   Defendants' Contentions of Fact and Law at 8-9.

6.   Plaintiffs' Exhibit 17; Defendants' Motion for Partial Summary Judgment at 8, 10.

7.   Kisor Memorandum, Plaintiffs' Exhibit 79; Defendants' Post-Trial Brief at 55.

8.   The due process significance of political asylum and withholding of deportation rights has been lessened by recent Ninth Circuit cases which have held that, generally, a special inquiry officer need not notify aliens of the right to apply for these forms of relief.  See, e.g., Duran v. INS, 756 F.2d 1338, 1341 (9th Cir. 1985) (asylum); Ramirez-Gonzalez v. INS, 695 F.2d 1208, 1212 (9th Cir. 1983) (withholding of

deportation). Notice, however, is required when the right to relief is "apparent" (8 C.F.R. § 242.17(a)) or when the special inquiry officer rather than the alien designates the country to which the alien is to be deported (8 C.F.R. § 242.17(c)).

9.    In addition to the rights discussed in the text, plaintiffs potentially face a loss of the privilege against self-incrimination, which is applicable to aliens only with respect to criminal prosecutions, United States v. Alderate-Deras, 743 F.2d 645,647 (9th Cir. 1984). Further, an alien who signs the voluntary departure form effectively places his or her fate in the hands of the INS, which then decides whether or not to effectuate a voluntary return. The evidence at trial indicated that, often, the INS detains children for substantial periods of time as it looks for relatives and makes its own decision concerning the child's future. If the children were encouraged to contact relatives or assisted in accessing legal assistance, the time of incarceration would be decreased. Therefore, these detentions impinge upon a liberty interest. Cf. Parham v. J.R., 442 U.S. 584 (1979) (child has liberty interest in not being confined unnecessarily for medical treatment). However, while plaintiffs possess these additional rights, the Court is of the view that the rights connected with the deportation hearing are the central interests affected.

10.    Although the Court has not found a pattern of mistreatment, it cannot ignore that INS agents no doubt encourage selection of voluntary departure. Use of voluntary

-33-

departure lessens the burden on the INS, and thus is the optimum choice from an agency perspective. The evidence was consistent with this view.

11. Chief Judge Kaufman's oft-quoted line is that the Immigration and Nationality Act bears a "striking resemblance [to] King Minos' labyrinth in ancient Crete." Lok v. INS, 548 F.2d 37, 38 (2d Cir. 1977).

12. In Orantes-Hernandez v. Smith, 541 F. Supp. 351, 377 (C.D. Cal. 1982), none other than the chief counsel for the INS pointed out that the atmosphere during interrogation is "so coercive that any notices may have little effect." It is interesting to note that counsel made this observation with respect to adults.

13. See Defendants' Motion for Partial Summary Judgment at 8, 10.

14. The instant case is distinguishable from United States v. Doe, 701 F.2d 819, 822 (9th Cir. 1983), in which the Ninth Circuit stated that, when parents could not be found, the government could notify a foreign consulate of juvenile delinquency proceedings against a minor alien. In Doe, notice was necessary so that the child would have a reasonable opportunity to be prepared. Id. In such a case, the consul's interest almost certainly would be the same as those of the minor. This case differs because of the strong possibility that the class member is fleeing for political reasons.

15. Other "safety valves" include the asserted absence of any requirement that the form be signed, the opportunity to withdraw consent at any time prior to

-34-

departure, and the length of time required to complete voluntary return arrangements for non-Mexicans. Addressing these in order, the Court saw little or no evidence indicating that a measurable portion of children failed to sign the form. Second, given that the class members did not understand their rights in the first instance, it is even less likely they would be able to grasp the concept of "withdrawal" of consent and then take the affirmative steps necessary to effectuate that withdrawal. Last, the "lag time" argument is unpersuasive in light of the evidence that several of the testifying class members were at the brink of deportation when third parties stepped in. The Court has little doubt that many class members were not so fortunate.

16. Cf. In re Gault, 387 U.S. at 35-36.

17. Communicating with counsel also would eliminate the only major problem with INS policy concerning children under fourteen whose parents or friends cannot be located, that is, reliance upon a foreign consul as the child's representative. Contacting counsel would appear to be the most efficient alternative when the INS or the minor has difficulty locating relatives or friends.

18. The Court sees no reason why an adult friend of the child or the child's family cannot serve as a representative for the minor. Friends would have the child's best interests at heart, and the Court believes the INS can be trusted to allow only those who are genuine friends to fulfill the representative role. In addition, the INS allows friends to act as representatives in certain situations, and the Court

-35-

wishes to defer to agency practices whenever possible.

19.  It should be made clear that it is the intention of the Court that class members be given the fullest opportunity to obtain the advice necessary to make an informed decision, and not merely the right to make and complete a single phone call.  If more than one call is required in order to satisfy this requirement, additional calls should be permitted.

20.  One concern of the Court in this area is that many Salvadoran class members are instructed to tell immigration officials they are Mexican in hopes of being returned to Mexico rather than El Salvador.  (Once returned to Mexico, the Salvadoran children can make another attempt to enter this country.)  The fear here would be that the INS would process these children as Mexicans apprehended near the border and thus use the less elaborate procedures.  The result, of course, would be a greater risk of unknowing waivers.

Two points meet this concern.  First, the evidence indicated that INS agents almost always can determine whether or not a Salvadoran child is lying.  For example, agents can check labels in the children's clothes to see where they were made or ask detailed questions about Mexico. Defense witnesses testified that once they discover a child is lying, the INS removes voluntary departure as an alternative and processes the class member for a deportation hearing.

Second, Mexican immigration officials will not accept non-Mexican children.  Therefore, even if the INS

erroneously processed a Salvadoran as a Mexican, it is unlikely that Mexican officials would allow the children to enter Mexico. Accordingly, the untruthfulness of some class members does not require the Court to alter its analysis.

21. The INS quite properly objected to the inadequacies of plaintiffs' proposed advisals. For example, the section on bail in the Spanish version of the advisal could be construed as soliciting a bribe.

22. The INS did present evidence that some of the field posts do not have telephones available. Thus, for those class members for whom telephone contact is required, the INS will have to either install phones at those facilities or transport class members to a better-equipped post before presenting the form. While this will carry with it some burden, the Court does not think it to be a sufficiently significant imposition to deny relief.

23. According to the INS, class members are used because the United States Attorney's policy is not to prosecute first-time juvenile offenders.

24. Relatedly, the INS makes a rather half-hearted standing argument, contending that plaintiffs do not face a real and immediate injury, or threat of injury. See City of Los Angeles v. Lyons, ___ U.S. ___, 103 S.Ct. 1660 (1983). This argument is without merit. In Nicacio v. I.N.S., ___ F.2d ___, No. 84-4074 (9th Cir. August 16, 1985), the Ninth Circuit distinguished Lyons and held that standing existed in a class action challenge to a pattern of unlawful traffic stops directed toward Hispanics on Washington highways. In

-37-

reasoning applicable to the instant case, the court found standing because there was: (1) recurrent violative conduct; (2) no threat of entanglement with state processes; and (3) foreseeability of harm to members of an entire class rather than to a single individual. Slip op. at 5. Similarly, plaintiffs here also have standing. See also LaDuke v. Nelson, 762 F.2d 1318 (9th Cir. 1985).

-38-